Donald **ENGEL**, Appellee,

v.

Robert D. **VERNON**, Appellant.

No. 56057.

Supreme Court of Iowa.

Feb. 20, 1974.

Nazette, Hendrickson, Marner & Humphreys, Cedar Rapids, for appellant.

Lynch, Dallas, Smith & Harman, Cedar Rapids, for appellee.

Heard before MOORE, C. J., and RAWLINGS, REYNOLDSON, HARRIS and McCORMICK, JJ.

REYNOLDSON, Justice.

This is an action in equity, for a partnership accounting and related relief. We affirm in part, reverse in part, and remand.

For about 20 years defendant Robert D. Vernon operated as an institutional food broker under the trade name, "R. D. Vernon Company." He represented a number of large food-processing companies ("principals") in selling their products on a commission basis to distributors or wholesalers ("customers") in Iowa, a county in Illinois, and South Sioux City, Nebraska.

For approximately six years prior to January 1, 1969, plaintiff Donald Engel was employed in the food division of Allied Chemicals Company, ultimately becoming sales manager.

November 19, 1968, Vernon and Engel executed an agreement to create a partnership in Vernon's business, effective January 1, 1969. The agreement was drafted by Vernon's attorney, following extensive negotiations during which Engel had a preliminary draft for about two weeks which he may have discussed with persons other than an attorney.

The agreement provided, "The name of the partnership shall be R. D. Vernon Company." Article III (1) stated:

"The original contribution to the partnership consists of the following: Rob-

ert D. Vernon contributes all the existing accounts of his operating business, food brokerage, in return for such contribution and as consideration for this partnership agreement Donald Engel agrees to make periodic payments to Robert D. Vernon as set out in the promissory note bearing even date herewith."

The original capital was to be contributed 55 percent by Vernon and 45 percent by Engel. Profits and losses were to be shared in the same proportions. Engel was required to purchase, and Vernon to sell, an additional one percent of the business each year for four years. In all matters "affecting or relating to the general policy of the partnership" Vernon was to make the final decisions.

Article VI of the agreement provides in part:

"1. Retirement, death, insanity, or bankruptcy of either partner shall work an immediate dissolution of the partnership. This article allowing a purchase of the partnership interest from a withdrawing partner will not be effective until two years from the effective date of this agreement.

"2. Either partner may retire and withdraw from the partnership, upon giving thirty (30) days' notice thereof in writing to the other partner. Such retirement shall become effective at the expiration of such thirty (30) day notice or at an earlier date with the consent of the other partner.

"3. In the event of the retirement, death, insanity, or bankruptcy of a partner, the remaining partner shall have the right to continue the business of the partnership under its present name by himself, or in conjunction with any other person or persons he may select, but he shall pay to the retiring partner, or to the legal representatives of the deceased, insane, or bankrupt partner as the case may be, the value of said partner's interest in the partnership as provided below.

"4. An appropriate evaluation of a business of this kind which is customary in the trade is to use the gross brokerage receipts of the last calendar year to determine the value of a business. It is agreed that such a valuation may be utilized in determining the value of the business with later computation in order to ascertain the particular interest and the value attributable to an individual partner based upon the 55–45% division noted elsewhere. In the event the partnership does not operate a full year, the agreed valuation figure to be used will be $40,000.

"5. Reciprocal life insurance policies in the following sums will be purchased and maintained by the partners:

On the life of Robert
D. Vernon      $15,000
On the life of Donald
Engel      $20,000

"The policy owned by the decedent on the life of the surviving partner may be purchased by the survivor at its cash surrender value or the sum of the premiums paid, whichever is more.

"6. In the event a continuance of the business is elected by the surviving partner, the life insurance proceeds shall be utilized to pay the heirs of the deceased partner for his share of the partnership, capital, assets, receivables, and good will of the business. The heirs of the deceased partner to receive from the life insurance the value as computed in paragraph four above. In the event a continuance of the business is elected by the remaining partner, in the case of a retirement or withdrawal due to retirement, insanity, or bankruptcy, the withdrawing partner's interest shall be purchased as provided in paragraph four above; life insurance not being involved."

Also of importance in this litigation are the provisions of Article VII:

"1. Unless dissolved by the retirement, death, insanity, withdrawal or bankrupt-

cy of a partner, the partnership shall continue until dissolved by agreement of the partners. Upon any such voluntary dissolution by agreement, the affairs of the partnership shall be liquidated forthwith. The assets of the partnership shall be first used to pay for all debts of the partnership. Thereafter any assets remaining after the paying of unpaid debts and the return of capital contributions shall be divided according to the profit sharing percentages set out above.

"2. Either partner with the written consent of the other shall have the right, in lieu of the liquidation provided for in the preceding paragraph, to continue the business of the partnership under its present name, upon compliance with the next above article, Article VI, after the partnership has been in existence for two years as set out therein. If such consent is not given because each desire to continue the business or for any other reason, then the affairs of the partnership shall be liquidated in accordance with the preceding paragraph of this article.

"3. Upon any dissolution under this article or the article next above, any payments not yet due, by Donald Engel under the terms of the promissory note noted above to be payable to Robert D. Vernon as consideration for this partnership agreement shall be cancelled and held to be null and void. Any sums of money must [sic] fall due prior to the date of any dissolution or withdrawal under any provisions hereof shall be properly retained by Robert D. Vernon and owed to him by Donald Engel.

"4. In consideration for Robert D. Vernon allowing Donald Engel to enter into this business operation and partnership agreement, Donald Engel agrees not to compete, enter into, or engage, alone or with or for others, in the food brokerage business anywhere in the State of Iowa after withdrawing from the partnership, or after either party should withdraw from the partnership, or it should be dissolved voluntarily. His agreement not to compete shall be binding upon the said Donald Engel for a period of three (3) years. Due to the difficulty in ascertaining the damages that would thereby be caused, the partner Robert D. Vernon, should the partner, Donald Engel, breach this paragraph, he hereby agrees to pay the sum of $50 a day in liquidated damages until an injunction issues stopping such competition. Robert D. Vernon agrees not to enter into or compete in the food brokerage business in the State of Nebraska."

In Article IX the parties provided for proper books of account to be kept at the principal place of business, Cedar Rapids, Iowa, by or under the supervision of Vernon, to be open to inspection by Engel.

The parties intended to expand the business into Nebraska. Vernon testified without contradiction he discussed this expansion into Nebraska with the principals he represented in Iowa. A number indicated interest. He determined there would be enough accounts to open an office in Omaha and cover Nebraska. Engel was set up in the Omaha office. He was given an established territory in western Iowa and was to promote the business into Nebraska. Vernon testified he made trips to Nebraska, worked in that territory, and his annual income in 1969 decreased as a result of taking in a partner.

The parties initially contributed $3000 capital in the proportions above indicated. This was later reimbursed and is not a factor in this litigation. Accounts receivable for the period prior to the partnership were retained by Vernon.

Vernon employed a Cedar Rapids accountant in July 1969 (six months after the partnership commenced) to set up and maintain cash basis records and accounts. The accountant reasoned the $14,000 payment Vernon received was for good will, the physical assets being of no consequence. As it represented a 45 percent interest in the business he assigned a total

value of $31,000 to good will on the books. Vernon neither objected to this accounting procedure nor to periodic statements and tax returns reflecting that amount as the good will valuation.

Late in 1969 Engel began to demand changes in the manner profit was being divided and expenses paid. He testified that during a six to eight month period he either threatened or indicated his desire to withdraw from the partnership on several occasions, both in letters and orally in person or by telephone. Vernon testified without contradiction Engel kept proposing that "you take Iowa and I will take Nebraska and let's forget about this thing and dissolve it." Finally, in July 1970 Engel wrote the following letter to Vernon:

"I can see we are miles apart on the contract. As I stated in the earlier letters I have no intention of paying the $2,000.00 unless our differences are resolved. I suggest you start dissolving immediately. I will make an offer to buy Des Moines and Sioux City for 4,000.00 or sell for the same. I suggest we dissolve Aug. 15 or Sept. 1st. or immediately if you desire. I will be back on Friday, August 7th. Will be out West on Monday, Tuesday & Wednesday. I can come to Cedar Rapids on Thursday (13) or Friday (14) if you are going to be there to start closing the books."

In the late afternoon of August 1, 1970, Vernon mailed the following response:

"This is to advise you that effective this date I will consider you having withdrawn from our Partnership Agreement. Your letters dated May 29, 1970, and July 30, 1970 clearly manifest your desire to withdraw. In addition, you have defaulted in your payment of money due for your interest in the partnership on this date. I also know this was your desire from our recent discussions.

"It is regrettable that you feel it necessary to take this action. It was my feeling that we could have had a successful business venture.

"I will review the books and determine what sum of money is due to you. I should be able to render an accounting of your compensation by August 15.

"I hereby and herewith revoke any and all authority you may have had on behalf of R. D. Vernon Company."

Both parties concede the partnership terminated August 1, 1970.

In 1969 the business had gross receipts in the amount of $46,815, of which $22,980 was attributable to the Omaha office and $23,835 to the Cedar Rapids office. On August 1, 1970 the "total net worth" of the business as shown on the firm's balance sheet was $32,192.68. This included good will valued at $31,000.

In the first week in August Engel was on the west coast. After writing the August 1 letter Vernon disconnected the firm's Omaha phone and arranged for the business calls to be transferred to his Cedar Rapids office. Upon his return Engel telephoned Vernon who told him he was going to do business in Nebraska. Vernon wrote to the firm's principals and customers to that effect, informing them he was going to maintain an Omaha office for R. D. Vernon Company and have an experienced man operating it before the end of August.

Engel received a letter dated August 19, 1970, from Vernon's lawyer, stating Vernon was not going to do business in Nebraska and reminding Engel of the covenant in the partnership agreement restricting him from doing business in Iowa, and the provision for liquidated damages of $50 per day for violating that provision.

Engel testified although there was a period of turmoil for about two weeks there was never any period of time when he was completely out of business. Of the 16 accounts he represented at time of trial, 11 or 12 were principals he represented when the partnership was operational. He cur-

rently calls on about 20 customers, and all of these were retained from the partnership business. Engel testified when he terminated his association with the R. D. Vernon Company he "pretty much took all of the business of R. D. Vernon Company in Nebraska after August 1, 1970." At all times after August 1, 1970 he continued to service former customers of the partnership in Souix City, Iowa. Engel's gross income in 1970, including his share of the commissions in controversy in this litigation, was approximately $21,500. He estimated his gross income in 1971 at about $24,000.

For several months before August 1, 1970, Engel destroyed sales documentation which was to have been forwarded to Cedar Rapids for accounting purposes. He testified he kept a record of checks he received and cashed for sales made prior to August 1, 1970. He admitted remembering one check for $570 only after a telephone call reminded him of it. When Engel filed his petition for partnership accounting on January 27, 1971 he alleged he had received and retained commissions in the sum of $782.68 for sales made before August 1, 1970. By stipulation during trial this was conceded to be $2422.72.

Vernon sent to Engel an "accounting" showing the latter owed Vernon $167.54. Vernon took the position Engel had forfeited his right to commissions Vernon received after August 1, 1970, for sales made before that date. At trial this sum by stipulation was conceded to be $9613.24.

Answering Engel's petition, Vernon alleged Engel had violated the partnership agreement in a number of specified ways, failed to pay the final $2000 installment on the promissory note, and prayed the petition be dismissed, and for equitable relief. Counterclaiming, Vernon alleged Engel had misappropriated partnership funds and prayed for actual and punitive damages. In a separate division he alleged the malicious breach of the covenant not to compete in Iowa and prayed for $50 per day liquidated damages as provided in the agreement, and for additional punitive damages in the amount of $5000.

Trial court concluded Engel's violations of the agreement did not damage Vernon and were not sufficient to forfeit his rights under that instrument. It further found both parties had waived the agreement's two-year provisions; the situation was a dissolution by agreement which occurred before the final $2000 installment on the note was due and it was therefore not an obligation; because Engel "is in effect receiving back his interest in the business by receiving back his initial cash outlay" he should not compete with Vernon in Iowa for the balance of the three-year period. The court noted no injunction had been sought.

Trial court denied Vernon's counterclaims. It awarded Engel judgment against Vernon for $16,248.45. This was arrived at by making adjustments for commissions each party had received and retained from partnership business, and by allowing Engel $12,000 for his "interest in the business" (good will), together with interest on the various amounts. In allowing Engel his "interest in the business" trial court apparently limited the sum to the amount Engel had paid Vernon on the promissory note.

Vernon has timely appealed, raising issues identified in divisions II through V which follow.

■ I. *Scope of review.* Actions for accounting and dissolution of partnerships sound in equity and receive a *de novo* review at our hands. We review the facts as well as the law and enter the conclusions we deem proper. Rule 334, Rules of Civil Procedure; Wolf v. Murrane, 199 N.W.2d 90, 100 (Iowa 1972); Bjornstad v. Fish, 249 Iowa 269, 87 N.W.2d 1 (1957); Owen v. Wilden Hospital, Inc., 245 Iowa 382, 383, 62 N.W.2d 186, 187 (1954).

II. *Issue of accounting for partnership good will.* Vernon asserts trial court was wrong in requiring him to pay Engel $12,000 for his interest in the business.

Good will was first defined by this court in 1875 as "nothing more than the probability that the old customers will resort to the old place." Norris & Cochran v. Howard, 41 Iowa 508, 511 (1875). A more sophisticated definition appears in Dare v. Foy, 180 Iowa 1156, 1160, 164 N.W. 179, 180 (1917), where, quoting from a prior decision, we said good will was:

> "The advantage or benefit which is acquired by an establishment, beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position or common celebrity."

See also the more extended definition in Taormina v. Culicchia, 355 S.W.2d 569, 573 (Tex.Civ.App.1962).

It seems apparent Vernon's brokerage business had good will in the form of a going operation with constant and habitual customers when the partnership was formed. In addition to an opportunity to learn the business from Vernon, there was no other reason for Engel, a successful business and sales person, to agree to pay Vernon $14,000 pursuant to the partnership contract. The personal property used in the business, as we have noted, was of little value.

It is equally apparent the same good will, on a larger scale, attached to the firm on August 1, 1970.

"Insofar as the partnership agreement covers the relationship of the parties, it is a contract between them." Wolf v. Murrane, supra, 199 N.W.2d at 97, and authorities there cited. But when we turn to that instrument to resolve the good will issue no clear solution is manifest. Article VI of the agreement, by its terms, was inapplicable before January 1, 1971. Article VII provides for a dissolution by agreement but is ambiguous as it relates to good will and the continued use of the partnership name. As it pertains to the situation presented here, the only plain provision of that article permits Vernon to retain any payments made on the promissory note falling due prior to the date of any dissolution of the partnership or withdrawal of a partner.

Because no clear-cut answer is gleaned from the parties' agreement, we turn to general principles of partnership law.

■ Ordinarily, good will is an asset of the partnership and included in an accounting upon dissolution or termination of the partnership agreement. Wolf v. Murrane, supra, 199 N.W.2d at 100; 60 Am.Jur.2d, Partnership § 282, pp. 184–86; 68 C.J.S. Partnership § 396, pp. 910–913; Annot., 65 A.L.R.2d 521 (1959, Later Case Service, 1967, Supp.1973).

■ In the absence of an agreement to the contrary the partner appropriating the firm's good will to his own use must account for its value. Wolf v. Murrane, supra, 199 N.W.2d at 100; Whitman v. Jones, 322 Mass. 340, 343, 77 N.E.2d 315, 317 (1948); 68 C.J.S. Partnership § 396, at p. 911; Annot., 65 A.L.R.2d 521, at 524.

In the case *sub judice*, the firm's business on August 31, 1970 had vastly expanded to include new business for old principals in Nebraska, new principals, and 20 new customers in that area. Using the agreement's formula (Article VI (4)) in which good will is measured by the yearly gross brokerage receipts, the good will on January 1, 1970 would have a value of $46,815. The fact Engel was able to estimate his gross receipts at $21,500 for 1970 and $24,000 for 1971 proves he was able to keep and maintain a share of the partnership good will commensurate with his 46 percent interest in the firm.

The applicable rule in this situation is found in the annotation, 65 A.L.R.2d 521 at 527:

> "Where the partner seeking an accounting has in effect received the benefit of his interest in the good will * * * an accounting has been denied."

See Somers v. Harris, 161 App.Div. 230, 238–239, 146 N.Y.S. 572, 578–579 (1914); Harstad v. Metcalf, 56 Wash.2d 239, 242–243, 351 P.2d 1037, 1038 (1960); Dyer v. Shove, 20 R.I. 259, 38 A. 498 (1897); Rice v. Angell, 73 Tex. 350, 355, 11 S.W. 338, 340 (1889).

An overview of all the circumstances persuades us these parties from the first intended, in event of a partnership termination, a division of partnership business (good will) approximately along the lines it in fact assumed. The partnership agreement, Article VII (4), indicates upon termination Vernon was to retain the Iowa business and Engel the Nebraska business. The aborted attempts to negotiate the partnership differences proceeded on that assumption. For example, Engel offered to buy or sell "Des Moines and Sioux City for $4000," without reference to the balance of the territory and without reference to reimbursement for payments already made on the promissory note. Another of Engel's letters offered to pay $2500 "for Nebraska" if Vernon did not elect to "buy" it.

Finally, aside from Vernon's initial threat to interfere with Engel's operation in Nebraska, and Engel's invasions of Sioux City, the separation of the business simply fell into place. In our opinion these parties in large measure made their own division of the good will of the partnership. See Somers v. Harris, supra.

■■ Ordinarily the partnership name is only an element of good will. See Kennedy v. Yost, 32 Del.Ch. 386, 392–393, 88 A.2d 297, 300 (1952). Here Engel seems to have convinced trial court that good will followed the partnership name alone. We are not so persuaded where, as here, location of the primary brokerage office was of little significance (Engel wanted it moved to Des Moines) and personalities of the respective partners played a dominant role in obtaining and retaining principals and customers.

It is true Vernon retained the firm title, which consisted mainly of his own name. The unfortunate communications Vernon sent to principals and customers in Nebraska shortly after August 1, 1970 made it clear, however, the business he proposed to continue was in his own right, not a continuation of the venture he had been engaged in with Engel. His use of his own name in soliciting the business of the firm's patrons, even though his own name had been the firm name, would not, in this case, be an appropriation of the good will after dissolution, there being no attempt to deceive people into believing they were dealing with the old firm. Pollock v. Ralston, 5 Wash.2d 36, 45, 104 P.2d 934, 938 (1940); 68 C.J.S. Partnership § 396 at p. 911.

Engel never asserted any right to the firm name, nor at any stage evidenced a desire to retain it for use in that part of the firm's territory he took over. He too solicited the firm's principals and customers in his own right, and was successful not only in Nebraska, but in Sioux City, as well.

■ We hold in this case there was a division of the firm's business and good will. No further accounting for that asset need be made as between these parties. Trial court was wrong in including $12,000 for this asset, and interest thereon, in the judgment granted Engel against Vernon. Upon remand, a judgment in conformance herewith should eliminate these sums.

III. *Issue of accounting for commissions received after dissolution.* Vernon contends trial court should not have compelled him to account for commissions received after August 1, 1970, on sales made before that date.

The applicable rule is laid down in Wolf v. Murrane, supra, 199 N.W.2d at 98:

"Upon dissolution, the partnership relationship ceases to exist except insofar as it is necessary to continue to wind up the affairs of the partnership. The effect of dissolution is stated in 60 Am. Jur.2d, Partnership, § 198, p. 111:

'*  *  *  Both under the Uniform Act (referring to Uniform Partnership Act, adopted in Iowa, Chapter 251, Laws

of the Sixty-fourth General Assembly, First Session, 1971, [now chapter 544, The Code, 1973] but not applicable to this case) and at common law it is recognized that after dissolution, the partnership continues only for the purpose of winding up the partnership affairs. Dissolution operates only with respect to future transactions; as to everything past, the partnership continues until all preexisting matters are terminated. Included in the winding up or liquidation of partnership affairs are the performance of existing contracts, the collection of debts or claims due the firm, and the payment of firm debts.'

See also 68 C.J.S. Partnership § 351, at pp. 859–860."

█ The brokerage commissions earned on sales before August 1, 1970 were claims due the firm—unfinished business plainly a part of the liquidation of partnership affairs. When collected, net amounts not required for payment of partnership debts should be distributed to the respective parties as their interests appear. This is the course trial court rightly selected in this case.

But Vernon asserts with respect to these commissions (and with respect to Engel's claim for good will, discussed in division II) Engel's several violations of the partnership agreement forfeited his right to all such benefits. Although it is apparent there were violations (for example, Engel's failure to carry insurance on Vernon's life) there is no evidence Vernon was damaged by this conduct.

█ No forfeiture as claimed by Vernon was provided for in the agreement. Generally, only when it is clear from the contract terms that the parties have agreed to make a contract which will result in a forfeiture will the forfeiture be enforced by a court of equity. 17 Am.Jur.2d, Contracts § 499, pp. 974–75.

█ Forfeitures are not favored by the courts. Bentler v. Poulson, 258 Iowa

1008, 1012, 141 N.W.2d 551, 553 (1966). A party claiming a forfeiture should show the equities are clearly on his side. See Van Hosen v. Bankers Trust Company, 200 N.W.2d 504, 508 (Iowa 1972) and authorities there cited.

█ More specifically, breaches of partnership articles, whether or not committed in bad faith, ordinarily do not cause a partner to lose his rights to share in the profits. Fisher v. Fisher, 352 Mass. 592, 595, 227 N.E.2d 334, 336–337 (1967); Walsh v. Atlantic Research Associates, 321 Mass. 57, 64, 71 N.E.2d 580, 585 (1947); 60 Am.Jur.2d, Partnership § 111, pp. 38–39.

█ We have considered related arguments advanced by Vernon that Engel's rights were lost because the partnership termination occurred within the two-year period referred to in the agreement. We find the cited language not sufficiently specific to be construed a condition subsequent to deprive Engel of his rights to the profits of the partnership. In so holding, we construe the contract against Vernon, whose counsel prepared the instrument. Walnut St. Baptist Church v. Oliphant, 257 Iowa 879, 886, 135 N.W.2d 97, 101 (1965).

IV. *Issue of enforcing the non-competition clause in the partnership agreement.* The non-competition clause in the agreement, triggered if either party withdrew from the partnership or upon its voluntary dissolution, required Engel not to compete in Iowa for three years. Upon breach of this provision, he was "to pay the sum of $50 a day in liquidated damages until an injunction issues stopping such competition." Vernon agreed not to compete in Nebraska.

Engel testified his business in Sioux City after August 1, 1970 generated gross receipts of only three to four dollars per day. He asserted he sold nothing there which competed with Vernon's principals, and further contended if he gave up Sioux City he would lose a large account (Del Monte) in the Nebraska· territory, as Sioux City

was tied into that area by this principal. Vernon did not refute the claim their products did not compete, except to testify he offered some whipped whitener for coffee which competed with Engel's coffee whitener. Vernon testified he might have more business in Sioux City at time of trial than before the partnership started.

Trial court's conclusions intimate Vernon waived the non-competition covenant by his actions with respect to the firm's Nebraska business immediately after August 1, 1970. But more specifically, the court then concluded because he was giving Engel "back his interest in the business by receiving back his initial cash outlay," the court would entertain an application for injunction for the remainder of the three-year period. No findings or conclusions relate to the matter of liquidated damages provided by the agreement. Trial court simply decreed, "No award is made on Defendant's Counterclaim."

It would be of little value and doubtful legality to consider an injunction at this time. Defendant did not ask for one in his counterclaim or before this court. The three-year period has expired. Generally, rights already lost and wrongs already committed are not subject to injunctive relief. See Jenkins v. Pedersen, 212 N.W.2d 415, 420 (Iowa 1973); Dobrovolny v. Reinhardt, 173 N.W.2d 837, 841 (Iowa 1970).

Turning to the matter of liquidated damages specified in the agreement, certain rules laid down in our case law apply.

We have said pre-estimated liquidated damages, in a weighing of interests, must ordinarily be found reasonable to be enforceable. Van Hosen v. Bankers Trust Company, supra, 200 N.W.2d at 508.

The fact the instrument contains a recital that the sum therein named is agreed upon as liquidated damages is not necessarily controlling as to its legal effect. Sanders v. McKim, 138 Iowa 122, 124, 115 N.W. 917, 918 (1908).

The court will look into all the circumstances and give effect to such an agreement only so far as equity and good conscience will permit; and if the sum stipulated is out of reasonable proportion to the loss or injury actually sustained or reasonably to be anticipated, it will be treated as a penalty. Independent Sch. Dist. v. Dudley, 195 Iowa 398, 403, 192 N. W. 261, 263 (1923); Elzey v. City, 172 Iowa 643, 646–647, 154 N.W. 901, 902 (1915).

Applying these principles to the facts before us, we conclude the damages provided in the agreement are out of all proportion to the actual damages, if any there were. The most that can be found in the record on this point is that a good broker, working in Iowa full time, might reasonably expect to earn $50 per day. Engel neither covers all of Iowa nor works full time here. To award damages in this instance would unbalance the division of good will we recognized in division II. Such a result would be inequitable in the circumstances of this case.

We hold Vernon is neither entitled to liquidated damages nor injunctive relief.

V. *Issue of punitive damages.* Vernon complains trial court wrongfully denied him punitive damages, citing Kuiken v. Garrett, 243 Iowa 785, 51 N.W.2d 149 (1952), for the proposition that such damages are recognized in breaches of contract if the breaches amount to an independent, willful tort.

Vernon's counterclaims prayed for punitive damages in the sum of $3000 for Engel's misappropriation of funds and in the sum of $5000 because Engel did business in Iowa following August 1, 1970.

Punitive damages are never allowed as a matter of right; when malice is shown or when a party acts with wanton and reckless disregard of the rights of others, punitive damages may be allowed. Katko v. Briney, 183 N.W.2d 657, 662 (Iowa 1971). The burden is on the defendant to prove facts entitling him to such damages. 22 Am.Jur.2d, Damages § 303, p. 402. Ordinarily, actual damages must be established as a condition precedent to an allowance of punitive damages. Holden v. Construction Machinery Company, 202 N.W.2d 348, 359 (Iowa 1972); McCarthy v. J. P. Cullen & Son Corp., 199 N.W.2d 362, 368 (1972).

It is not evident to us that Engel's acts constituting breaches of the agreement were wholly without justification, or taken with wanton and reckless disregard of Vernon's right. Further, as we have already indicated, there is no evidence Vernon sustained any actual damage.

Under these circumstances, trial court was right in denying recovery for punitive damages.

VI. *Other issues.* We have examined other arguments and issues raised by Vernon and find them to be without merit.

Although the court reserved "ruling on the Del Monte, Rogers and Suter Accounts Commissions," and jurisdiction relative to an injunction, we have considered on our own initiative the question whether this was a final judgment and have concluded it was. Rule 331, R.C.P. Time has resolved the injunction matter. We hold under this record Engel is not required to account further for the disputed commissions paid by Del Monte, Rogers and Suter.

This case is remanded for judgment in conformance with this opinion.

Affirmed in part, reversed in part, and remanded.