**Robert HOWE et al., Plaintiffs,**

v.

**UNITED PARCEL SERVICE, INC.,
Defendant.**

**Civ. No. 74-15-D.**

United States District Court,
S. D. Iowa,
Davenport Division.

Aug. 12, 1974.

Yale H. Iverson, West Des Moines, Iowa, for plaintiffs.

Kimber E. Vought, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Albert L. Harvey, Stewart, Heartney, Jones, Brodsky & Thornton, Des Moines, Iowa, for defendant.

## ORDER

STUART, District Judge.

### I. The Case

This action was originally instituted in the State Court of Iowa. It was removed to this Court by the defendant, United Parcel Service, Inc. (UPS), pursuant to the provisions of 28 U.S.C. § 1441. The Court has original jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983 to redress the alleged deprivation of civil rights.

In their complaint plaintiffs allege that UPS has deprived them of their rights under the First and Ninth Amendments to the Constitution of the United States as made applicable to the states through the Due Process Clause of the Fourteenth Amendment. Plaintiffs contend that their rights were violated when UPS warned them that they could not continue in their present jobs

as parcel delivery drivers because they were not in compliance with UPS grooming standards relating to hair length.

UPS has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the ground that the threshold requirement of state action prescribed by the Fourteenth Amendment has not been met where, as here, a private delivery service requires employee compliance with its hair grooming standards. Plaintiffs have resisted the motion on the ground that defendant has a sufficient nexus with or dependence on the state to make some of its actions under color of state law. The parties have filed briefs in support of their positions and a hearing on the motion was held July 1, 1974.

## II. State action

The sanctions of 42 U.S.C. § 1983 apply to "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory" deprives another individual of rights secured by the Constitution. The threshold requirement is the satisfaction of the "color of State law" test. This test has generally been held to be the equivalent of the Fourteenth Amendment prohibition that "No State shall * * *", known as the "state action" requirement. United States v. Price (1966), 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267. However, "at least one court has indicated its belief that the 'color of state law' test may be more demanding". Jackson v. Metropolitan Edison Co. (3rd Cir., 1973), 483 F.2d 754, 757 n. 4, citing Lavoie v. Bigwood (1st Cir., 1972), 457 F.2d 7, 15. See Adickes v. Kress (1970), 398 U.S. 144, 171 and 210, 90 S.Ct. 1598, 26 L.Ed.2d 142. The distinction, if it is, in fact, a substantial one, has not been borne out by the case law. For example, Moose Lodge No. 107 v. Irvis (1972), 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627, involved a § 1983 claim, yet the Court spoke of state action throughout the opinion. For the purpose of this opinion "under color of law" and "state action" will be treated as synonomous.

A review of the case law on state action reveals a great diversity of factual situations. For this reason, no clear-cut tests have been developed to determine the presence or absence of the required state involvement. The Supreme Court recognized this problem and developed what will probably be as close to a definitive state action test as can be expected in Burton v. Wilmington Parking Authority (1961), 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45. Justice Clark speaking for the Court in *Burton* stated:

It is clear, as it always has been since the *Civil Rights Cases* [109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883)] that 'Individual invasion of individual rights is not the subject matter of the [Fourteenth] amendment.' [*Id.*] at 11, 3 S.Ct. at page 21, and that private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to become involved in it. * * * [T]o fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which 'This Court has never attempted.' [Citation omitted] Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance. 365 U.S. at 722, 81 S.Ct. at 860.

This "sifting and weighing" test has been consistently utilized by the courts since its statement in 1961. While this is probably the only possible test, it is really no test at all. Consequently, the primary tool to be used in the analysis of a state action problem is the tool of analogy. By a careful analysis of the state-UPS relationship, and a comparison with the "sifting and weighing" done by the courts in the past, the presence or absence of the requisite state action may be determined.

III. Five generic patterns in the case law concerning state action.

██ As the law of state action has developed, five distinguishable patterns have emerged. See Jackson v. Metropolitan Edison Co. (3rd Cir., 1973), 483 F. 2d 754, 757; Bond v. Dentzer (N.D.N.Y., 1973), 362 F.Supp. 1373, 1377. These patterns are as follows:

(1) *State Officer or Agent*—Where the State acts through its own designated officers or agents. This pattern is inapplicable to the case at bar and will not be pursued further.

(2) *Joint Venturer*—When a private party's action occurred in conjunction with a business in which the state may be considered a partner or joint venturer in a profit making field. See *Burton,* supra.

(3) *Encouragement*—Where the state authorizes, encourages or creates an atmosphere where private interests deprive individuals of their constitutional rights. This may take the form of state inaction, whereby private individuals acting with the blessing of the state can accomplish what the state could not do directly. Reitman v. Mulkey (1967), 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830; Adickes v. Kress (1970), 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142.

(4) *Affirmative Approval*—When a state agency affirmatively orders or specifically approves the challenged activity in the course of its regulatory rule making. Public Utilities Commission v. Pollak (1952), 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068.

(5) *Traditional State Function*— Where functions normally or traditionally performed by the state are delegated to or performed by private interest. Marsh v. Alabama (1946), 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265.

These five patterns provide a useful structure within which to analyze and apply the law of state action to the facts of the present case.

A. *Joint Venturer.*

The leading case in this area is *Burton,* supra. The case was explained in *Moose Lodge,* supra 407 U.S. at 172, 92 S.Ct. at 1971 as follows:

The Court held * * * that a private restaurant owner who refused service because of a customer's race violated the Fourteenth Amendment, where the restaurant was located in a building owned by a state-created parking authority and leased from the authority. The Court, after a comprehensive review of the relationship between the lessee and the parking authority concluded that the latter had 'so far insinuated itself into a position of interdependence with Eagle [the restaurant owner] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.'

In addition to the symbiotic partnership arrangement, the Court in *Burton* "could point to a specific state statute which was said to permit the offending conduct" as a further ground for finding state action. *Jackson,* supra 483 F. 2d at 757; *Burton,* supra 365 U.S. at 726, 81 S.Ct. 856 [concurring opinion, Stewart, J.]. The statute's existence strengthens the finding of a close relationship between the state and the restaurant. This aspect of *Burton* is analogous to the "encouragement" pattern hereinafter discussed.

Ihrke v. Northern States Power Co. (8th Cir., 1972), 459 F.2d 566, reversed due to mootness (1972), 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72, also involved state action of the joint venture variety. *Jackson,* supra 483 F.2d at 759. In *Ihrke* the Court held that the action of the defendant utility in threatening to terminate service to customers was under color of state law. In reaching this result the Court noted that the city which regulated the utility also received 5% of the company's gross earnings. Thus, the city and the utility benefited mutually from the payment of bills resulting from the company's threat to terminate service. 459 F.2d at 568.

Two other factors contributed to the finding of state action: (1) The utility had what amounted to an exclusive franchise to furnish utility services, and as a practical matter the plaintiffs could not buy service from any other source. 459 F.2d at 569–570. (2) Although the utility prepared its own regulations, the city council had the right to review, and revise or reject the regulations including those relating to the termination of service. 459 F.2d at 568–570. These two additional factors further "insinuated" the state into a position of interdependence with the utility and strengthened the finding of state action.

The Court in *Ihrke* adopted the formulation proposed by Judge Kerner in his concurring opinion in Kadlec v. Illinois Bell Telephone Co. (7th Cir., 1969), 407 F.2d 624, 627, cert. denied, 396 U.S. 846, 90 S.Ct. 90, 24 L.Ed.2d 95. This formulation was to be used to determine if a sufficient nexus or dependence on the state existed to make some of the actions of a privately-owned, publicly-regulated utility under color of state law. 407 F.2d at 628. In *Kadlec* the only state connection with the activity complained of was that the "defendant company filed its regulations with state authorities; the state in no sense benefited from, encouraged, requested, or cooperated * * *". *Id.* at 626. *Ihrke,* supra 459 F.2d at 568. Hence, the requisite nexus was absent and there was no state action. *Ihrke,* on the other hand, presented a different situation. The Eighth Circuit recognized the difference when it invoked Judge Kerner's nexus formulation and found state action. *Id.*

The facts in *Ihrke* justify a finding of state action because of the symbiotic relationship between the city and the utility. First, there was the mutual benefit of shared earnings between the city and the utility. Second, the city regulated the very activity complained of. The Eighth Circuit characterized the extent of the regulation in *Ihrke* as follows: "The city reserved to itself the right to review, reject, or revise regulations pro-

mulgated by Northern [the defendant utility], including, we assume, regulations relating to termination of service for nonpayment of bills [the activity complained of]." *Id.* at 570.

This second aspect of *Ihrke* is particularly important. In order to justify a finding of state action, "the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of complaint." Powe v. Miles (2nd Cir., 1968), 407 F.2d 73, 81. See also, Marker v. Shultz (1973), 158 U.S.App.D.C. 224, 485 F.2d 1003, 1007; Driscoll v. Int'l Union of Op. Eng. Local 139 (7th Cir., 1973), 484 F.2d 682, 690; *Jackson,* supra 483 F.2d at 756 (speaking of the Supreme Court's holding in *Moose Lodge,* the Third Circuit in *Jackson* said "The Court thus recognizes the importance of a connection between the state regulation and the proscribed conduct."); Martin v. Pacific Northwest Bell Telephone Co. (9th Cir., 1971), 441 F.2d 1116, 1118; Barrett v. United Hospital (S.D.N.Y., 1974), 376 F.Supp. 791; Stern v. Mass. Indemnity and Life Insurance Co. (E.D.Pa., 1973), 365 F. Supp. 433, 438; Salisbury v. Southern New England Telephone Co. (D.Conn., 1973), 365 F.Supp. 1023, 1024.

Plaintiffs in the case at bar contend that *Ihrke* is controlling and that UPS involvement with the State of Iowa meets the guidelines found in *Ihrke*. Plaintiffs would have the Court find the requisite nexus in two aspects of the UPS business: (1) the use of the public highways by UPS, and (2) the close state regulation of UPS. In regard to the first contention it can simply be said that private use of state furnished services such as highways, electricity, water, and police and fire protection does not significantly involve the state with a private institution in order to bring the private action within the scope of § 1983 or the amendments to the Constitution.

See *Moose Lodge,* supra 407 U.S. at 173, 92 S.Ct. 1965.

Plaintiffs place heaviest reliance on the second contention that the close state regulation satisfies the nexus requirements of state action. However, more than mere regulation must exist. If *Ihrke* is to be used as authority justifying a finding of state action, there must exist a sufficient interdependency between Iowa and UPS amounting to a joint venture or partnership. This interdependency is clearly not present. Iowa does not require UPS to pay any percentage of its gross earnings to the state as in *Ihrke*. Nor is UPS paying rent to the state as in *Burton*. More importantly, there are no allegations that Iowa has in any way been involved in regulating the development or enforcement of the challenged UPS grooming standards. The requisite nexus is not present and plaintiffs' reliance on *Ihrke* is misplaced. If anything the case at bar is more closely analogous to *Kadlec* where filing of company regulations with the state was held not to constitute a sufficient nexus with the state to justify a finding of state action. This case presents even a less compelling situation than *Kadlec* because UPS does not file its grooming regulations with the state. There is nothing to indicate the Eighth Circuit would go so far as to find state action in a case analogous to *Kadlec*. Indeed, its recognition of the differences between *Kadlec* and *Ihrke* implies a reluctance to go any farther than *Ihrke*.

### B. *Encouragement.*

■ When a state statute or custom or usage having the force of law by virtue of the persistent practices of state officials compels the result, the encouragement by the state amounts to state action. See Adickes v. Kress (1970), 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142; *Jackson,* supra 483 F.2d at 757. *Adickes* involved a private restaurant and a state custom of racial discrimination in eating places enforced by a police officer.

To create an atmosphere of encouragement, "the state need not take an affirmative role in the acts depriving another of constitutional rights; it is enough that the consequences of state 'neutrality' allow private interests to do so". Reitman v. Mulkey (1967), 387 U.S. 369, 381, 87 S.Ct. 1627, 18 L.Ed.2d 830. Bond v. Dentzer, supra 362 F.Supp. at 1379. In *Reitman* California had several statutes prohibiting racial discrimination in housing. Proposition 14 was passed by the voters making it illegal to deny an individual the right to dispose of property as he chooses. The effect of proposition 14 was not only to repeal the previous anti-discrimination statutes but provide state authority to discriminate free of interference of any kind from official sources. The result was to "significantly encourage and involve the State in private discrimination". Neutrality is permissible but the involvement of California was significant enough to amount to encouragement of the prohibited activity in violation of the Fourteenth Amendment. "The lesson of Reitman is that state policy is not necessarily what the state law says it is, rather what the policy *de facto* is found to be." Bond v. Dentzer, supra 362 F.Supp. at 1379. See also *Moose Lodge,* supra 407 U.S. at 176–177, 92 S.Ct. at 1973, wherein the Supreme Court recognizes the "encouragement" pattern with the following language: "However detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination."

■ Has the State of Iowa explicitly or implicitly encouraged the grooming standards of UPS? There has been no allegation of direct state action. Furthermore, the State has apparently never regulated in the area of grooming standards for its motor carrier licensees. The regulation of motor carriers in general does not imply the specific encouragement necessary to invoke the rationale of *Reitman*. State policy as to grooming standards must be considered neutral and the requirements for the

"encouragement" state action pattern have not been met.

### C. *Affirmative Approval.*

Public Utilities Commission v. Pollak (1952), 343 U.S. 451, 461–463, 72 S.Ct. 813, 96 L.Ed. 1068, found sufficient government involvement where the commission, after conducting hearings, affirmatively approved the action which was in question. *Pollak* concerned the First and Fifth Amendments and the actions of the federal government. However, the problem of federal government involvement is sufficiently similar to the problem of state involvement that *Pollak* provides authority for the state action cases.

In *Pollak* the Court was specifically looking for affirmative approval of the challenged activity by the government. The Court did not rely on the fact that the private entity was a public utility or that it had a substantial monopoly. *Pollak*, supra at 462, 72 S.Ct. 813. The case, therefore, "is not authority for the holding that the actions of a public utility which enjoys a monopoly, *ipso facto*, are those of a state agency, nor does it hold that all activities conducted under the auspices of a utility regulatory body satisfy the 'color of state law' test". *Jackson*, supra 483 F.2d at 757 [*Jackson* followed the *Pollak* rationale and found no state action because of no affirmative approval of the complained of activity by the state utility commission. *Jackson*, supra 483 F.2d at 758.] See also *Moose Lodge*, supra 407 U.S. at 175–176 n. 3, 92 S.Ct. 1965 [affirmative approval of activity required]; Driscoll v. Int'l Union Op. Eng. Local 139, 484 F.2d 682, 691 (7th Cir., 1973). It appears that the "affirmative approval" pattern is simply a more specific statement of the nexus requirement which is that the state must be involved with the activity that caused the injury in order to find state action.

█ There has been no allegation of affirmative approval of the grooming standards of UPS by the State of Iowa.

There can be no finding of state action on the basis of this generic pattern.

### D. *Traditional State Function.*

There is a long line of public function cases where state action has been found. See Marsh v. Alabama (1946), 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265; Terry v. Adams (1953), 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152; Evans v. Newton (1966), 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373; Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza (1968), 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603. Although not argued by plaintiffs, this line of cases might appear to be applicable to the operations of UPS. In order to operate within Iowa UPS was required to obtain a certificate of convenience and necessity from the Iowa State Commerce Commission. Iowa Code § 325.6. The granting of this certificate is conditioned upon a finding that UPS would promote the public convenience and necessity. Iowa Code § 325.7. This demonstrated public character of UPS service raises some questions about the applicability of the "traditional state function" pattern. The argument could be made that UPS was the "functional equivalent" of the United States Post Office (see *Logan Valley*, supra 391 U.S. at 318, 88 S.Ct. 1601) and the function that it performed was essentially municipal in nature (see *Evans*, supra 382 U. S. at 302, 86 S.Ct. 486).

█ One normally associates parcel delivery with government action. Indeed, defendant admits the similarity between UPS and the United States Postal Service in its brief in support of the motion for summary judgment. It is the opinion of the Court that this is not a sufficient similarity upon which to base a finding of state action. The "functional equivalent" concept appears to have been sharply limited in Lloyd Corp., Ltd. v. Tanner (1972), 407 U.S. 551, 562–563, 92 S.Ct. 2219, 33 L.Ed.2d 131, and, thus, the concept would be of doubtful utility in the present case. The public function analogies are insuf-

ficient for the added reason that parcel delivery service has never been a state monopoly in this country. This factor was significant to Judge Friendly in Powe v. Miles (2nd Cir., 1968), 407 F.2d 73, 80, where it was held that the public function theory would not apply to education because "[e]ducation has never been a state monopoly in this country * * * ". This conclusion was based on *Evans, supra,* wherein Justice Douglas wrote:

> The range of government activities is broad and varied, and the fact that government has engaged in a particular activity does not necessarily mean that an individual entrepreneur or manager of the same kind of undertaking suffers the same constitutional inhibitions. While a State may not segregate public schools so as to exclude one or more religious groups, those sects may maintain their own parochial educational systems. *Id.* 382 U.S. at 300, 86 S.Ct. at 489.

Parcel delivery service is more closely analogous to parochial schools than it is to a fire department, police department, park, company town, or public election (*Id.* at 302, 86 S.Ct. 486), and a finding of state action on the basis of the municipal service UPS performs would not be justified. The analogy to education is particularly important because the majority of the litigation involving "long hair" cases arising in the past few years has involved male high school students and high school appearance regulations. See Bishop v. Colaw (8th Cir., 1971), 450 F.2d 1069; Crews v. Cloncs (7th Cir., 1970), 432 F.2d 1259; Breen v. Kahl (7th Cir. 1969), 419 F.2d 1034. These high schools were *public* high schools.

One particular aspect of the public function concept is noticeably absent here. The public function concept "has heretofore been limited in its application to situations where the constitutional violation alleged occurred in the very activity in which the private institution performed its 'traditionally governmental function'." Barrett v. United Hospital (S.D.N.Y., 1974), 376 F.Supp. 791 at 799. Assuming for the moment that UPS does perform a traditionally governmental function, the challenged grooming standards are not the activity in which UPS performs that public function. The public function involved is the delivery of parcels to the public, and not the promulgation of internal regulations concerning employees. Similarly, "[i]t is doubtful that the Supreme Court would have applied the 'public function' theory to the park in *Evans* had the complaint concerned the discharge of groundskeepers without a full meeting complete with all the protections of due process". *Barrett, supra* at n. 37. It will not do to argue that the grooming standards relate to the public function because of the public image they are designed to project. All internal regulations can in some way relate to the performance of the public function. The grooming standards resulted from a purely private decision and in no way involved the public.

### IV. *A Double Standard for State Action.*

The argument that a "less onerous" standard for finding state action exists in cases of racial discrimination has been made from time to time. See *Barrett, supra* at 797; Lefcourt v. Legal Aid Society (2nd Cir., 1971), 445 F.2d 1150, 1155, n. 6; Bright v. Isenbarger (N.D.Ind., 1970), 314 F.Supp. 1382, 1392–1394; Stern v. Mass. Indemnity and Life Insurance Co. (E.D.Pa., 1973), 365 F.Supp. 433, 438 (contention found unpersuasive). This argument is not altogether illogical. Though state action would at first appear to be one of those things "you either have or you don't", the offensiveness of the conduct may justify a shifting standard. Wahba v. New York University (2nd Cir., 1974), 492 F.2d 96, 102. Hence, it is argued that racial discrimination is so offensive that the government should in no way be implicated in it and judicial scrutiny of state involvement need not be as strict as in situation involving less offensive conduct. A similar double standard of

judicial scrutiny is utilized in analysis under the Equal Protection Clause where classifications based upon race, alienage, and national origin, for example, are treated as inherently suspect and subject to close judicial scrutiny, while classifications based on other considerations are subject to a less stringent standard. See, e.g., Frontiero v. Richardson (1973), 411 U.S. 677, 682–683, 93 S.Ct. 1764, 36 L.Ed.2d 583; Loving v. Virginia (1967), 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010.

Assuming the validity of the double standard for the moment, the holding in *Burton* which involves racial discrimination would be of only limited applicability and reliance on it by the plaintiffs may be misplaced. See also *Jackson*, supra 483 F.2d at 759 where the court felt compelled to assess the underlying federal rights involved before reaching a final conclusion as to the question of state action. Any such assessment here would undoubtedly result in the conclusion that the hair length standards are not of the same constitutional magnitude as racial discrimination and, it is believed, not deserving of the same constitutional scrutiny. The absence of the compelling situation of racial discrimination while not controlling here, is another factor to be taken into consideration when "sifting and weighing" the circumstances of the case.

### V. *Conclusion.*

■ (1) No state officers or agents are involved with the grooming standards. (2) UPS is not involved in a joint venture with the State of Iowa. (3) There has been no state compulsion or implicit encouragement of the grooming standards. (4) There has been no affirmative approval of the grooming standards by the State. (5) UPS does not perform a traditional state function, and, in any event, the enforcement of grooming standards is not the activity in which the public aspects of the UPS operation are performed. Hence, the facts of this case are not sufficiently analogous to any generic pattern of state action, and a finding of state action would not be justified. The absence of state action is emphasized by two other factors: (1) The nexus between UPS and the State of Iowa was insufficient because the state was not involved with the challenged activity, and (2) Hair length standards do not justify the same judicial scrutiny as do cases of racial discrimination.

In the interest of preserving the public-private dichotomy, the internal management decision of UPS to promulgate and enforce grooming standards will not be disturbed. Accordingly, defendant's motion for summary judgment is granted pursuant to Fed.R.Civ.P. 56(c) on the ground that the threshold requirement of state action has not been met, and

It is hereby ordered that judgment be entered in favor of the defendant, United Parcel Service for the costs of this action.