**Merle D. JENSEN, Appellant and Cross-Appellee,**

v.

**Dennis SCHRECK and Jerome Schreck, Appellees and Cross-Appellants.**

**Dennis SCHRECK and Jerome Schreck, Appellees and Cross-Appellants,**

v.

**Howard RANDOLPH, Appellant and Cross-Appellee.**

**No. 59612.**

Supreme Court of Iowa.

Feb. 21, 1979.

Fred Louis, Jr. and Robert Kohorst, Louis, Moore & Kohorst, Harlan, for appellants and cross-appellees.

Claus H. Bunz and John R. Mugan, Hansen, Bunz & Mugan, Manning, for appellees and cross-appellants.

Considered by REES, P. J., and McCORMICK, ALLBEE, McGIVERIN and LARSON, JJ.

LARSON, Justice.

This action arises out of a joint venture of Howard Randolph, Dennis Schreck and Jerome Schreck, known as Rolling Ridges Ranch, a farming and livestock operation in Guthrie County. This venture fell on hard times and was dissolved as of December 31, 1970. An action for collection of an account was followed by a cross-petition for an accounting and to set aside a real estate contract forfeiture. It is from the trial court's decree in the accounting and its ruling on Randolph's proceedings to forfeit a real estate contract with Dennis Schreck that this appeal and cross-appeal are taken. The original plaintiff, Jensen, is no longer party to these proceedings. We modify the decree of the trial court and remand for further proceedings.

The joint venture agreement between Randolph and Schrecks was executed on October 18, 1968, but was "deemed to have commenced on June 1, 1968." Randolph was to provide the land, and the Schrecks the labor, for this venture. Profits and losses were to be borne one-half by Randolph and one-half by the two Schrecks. All machinery, livestock and farm produce were to be owned one-half each; however, the initial contributions of these items were made largely by Randolph, together with all of the starting capital. The joint venture agreement's provisions (or lack of them) regarding Randolph's right to interest on these excess contributions gave rise to part of the dispute here. During the life of the joint venture, Randolph deposited to Schrecks' bank account several payments, agreed by all parties to be for living ex-

penses, and totaling $11,000. Randolph contends this was a loan to Schrecks, to be repaid upon final joint venture settlement; they say it was a gift, and even if it was a loan Randolph forgave it. The facts will be stated in more detail as they apply to disposition of this issue. The trial court also held forfeiture of Schrecks' right under a real estate contract was not illegal on grounds of unconstitutionality or unconscionability.

The issues for determination are: (1) did the trial court correctly rule in the accounting case as to the rights and liabilities of the joint venturers in the farming operations; (2) did it correctly deny Randolph recovery of the $11,000 "living expenses"; and (3) did it correctly rule that the forfeiture provision of the real estate contract was enforceable?

## I. Joint venture accounting.

The trial court ordered the appointment of a certified public accountant as a master under Rule of Civil Procedure 207. The master examined the records of the joint venture and filed his report with the court. He was also examined and cross-examined at the trial. His allocation of certain items of expense to the joint venture and to them personally give rise to some of Schrecks' complaints on this appeal, even though the trial court did not consider those matters in the decree. We have examined the report of the special master and based upon it, and the other evidence presented at trial, conclude modifications in the accounting must be made.

After Schrecks served notice in May, 1970, of their intention to terminate the joint venture at the end of the year, they entered into a contract with third parties to sell them their interest in the joint venture for $58,000. That sale agreement provided:

"AGREEMENT

"We hereby purchase from Schreck Brothers their ½ of all of the machinery and tools and including Silo 3 and 4 on North farm and 2 & 3 on South farm, including all hay and straw now on farms for $58,000.00. Also, $55.00 per foot of silage left in Silo 1 and 2 on North farm. Dated this 12th day of October, 1970.
     "SIGNED
          /s/ Harold R. Craig
          /s/ May Craig
"Accepted: Schreck Brothers
/s/ Dennis Schreck
/s/ Jerome Schreck
"Approved:
/s/ Howard Randolph   "

The trial court used this sale figure to determine the value of Schrecks' interest as of January 1, 1971. It said:

"It is noted this agreement [for sale of one-half] . . . was accepted by the Schrecks and approved by Randolph and that the value for the items and property therein contained which represents the Schrecks' ½ interest in the joint venture operation was determined to be the sum of $58,000.00, and to be payable by January 1st, 1971. Thus, the value of Schrecks' ½ interest in the joint venture at the time of termination thereof is clearly established in the sum of $58,-000.00 . . . ."

It deducted $4,914.79 from separate transactions to arrive at a net amount owed by Randolph to Schrecks of $53,085.21. Appellant complains that this computation failed to give consideration to several matters involved in the venture, and we agree.

The law governing operations of, and accountings in, joint ventures is that generally applicable to partnerships. *Berry Seed Co. v. Hutchings,* 247 Iowa 417, 427, 74 N.W.2d 233, 239 (1956); *Goss v. Lanin,* 170 Iowa 57, 61, 152 N.W. 43, 45 (1915).

Actions for accounting upon dissolutions of partnerships are in equity and our review is therefore de novo. *Engel v. Vernon,* 215 N.W.2d 506, 512 (Iowa 1974). We are not bound by the findings of the trial court but give weight to them. *In re Marriage of Winegard,* 257 N.W.2d 609, 613 (Iowa 1977).

We conclude that the award to Schrecks by the trial court was incorrectly based upon the amount of the sale price and failed

to consider underlying claims and obligations which must be considered in an action for accounting.

### A. Recovery of excess capital contributions and interest.

Pursuant to the joint venture agreement, Randolph contributed $20,000 in operating capital, $59,375 in machinery and $120,480 in inventory, or a total of $199,855. Schrecks contributed $22,120 in machinery but no livestock or other inventory and no operating capital. No balancing payments for these contributions were made, nor was there any interim accounting between the parties.

The joint venture agreement provided that Randolph would be repaid for his excess contributions of inventory. It stated that:

> Second parties agree to pay to first party $60,240.00 which is based on said inventory. Payment shall be made thereon on November 1, 1968, to first party by the execution of promissory notes secured by a security agreement on said property by second parties.

This promissory note was never executed and the right of Randolph to recover the principal involved is apparently not seriously resisted by Schrecks.

Randolph's advance of $20,000 in cash was made by him pursuant to this provision:

> He [Randolph] further agrees that on November 1, 1968, he will deposit to the account of Rolling Ridges Ranch the sum of $20,000 in the bank thereafter designated to be used in the conduct of this venture and that he will thereafter furnish funds or obtain the necessary credit to supply operating funds to said venture and carry out any operation that the parties may mutually agree upon. All bank notes shall be signed by all parties to this agreement. Interest at the current bank rate shall be charged.

He has not been repaid this amount.

Randolph's excess contribution of machinery is to be considered in light of this provision:

> Whichever party's machinery shall be appraised at the lower figure shall pay to the other party one-half of the difference between the said two appraisal valuations on January 1, 1969.

The respective contributions of machinery were not appraised. However, it is undisputed that Randolph's contribution was $37,255 greater than Schrecks'.

One of the issues on appeal is whether Randolph should collect interest on his excess capital contributions for inventory, machinery and cash. The agreement is not clear in this regard, but does say in part that "no interest shall be charged [by Randolph] to the venture on money advanced by him or borrowed for said operation." Schrecks contend this provision controls, but that in any event, if the contract is ambiguous as to this matter such ambiguity must be resolved against the party drafting the agreement. They contend it was drawn by Randolph's attorney; Randolph and the attorney stated he acted for the joint venture—not for either party. The trial court did not decide the issue of Randolph's right to recovery for his excess capital contributions and therefore did not decide whether interest was collectible on them. The agreement in relevant part provided:

> [Randolph] agrees that he will finance all operations of said venture *up to November 1, 1968,* and that no interest shall be charged to the venture on money advanced by him or borrowed for *said operation.* He further agrees that on November 1, 1968, he will deposit to the account of [the joint venture] the sum of $20,000.00 in the bank hereinafter designated to be used in the conduct of the venture and that he will thereafter furnish funds or obtain the necessary credit to supply operating funds to said venture and carry out any operation that the parties may mutually agree upon. All bank notes shall be signed by all parties to this agreement. *Interest at the current bank rate shall be charged.* (Emphasis added.)

Schrecks contend the phrase "no interest shall be charged" controls. However,

a fair reading of the agreement persuades us otherwise. This phrase follows a specific and limited agreement by Randolph to finance the operation up to November 1, 1968, and the agreement provides that no interest shall be paid for *"said operation."* Even without regard to the balance of the quoted provision, it appears this waiver of interest is only as to the period before November 1, 1968. The quoted paragraph, after stating Randolph's duty to furnish funds or arrange for bank loans, further provides that "interest at the current bank rate shall be charged." This presumably would apply to Randolph's advances; the bank would obviously charge their own rates, and no agreement to pay them would be required in the agreement. Most important, as to advances for excess inventory and machinery, there was no need for providing separately for interest; the inventory was to be settled for by Schrecks' executing a promissory note, secured by a security agreement on November 1, 1968, which would include interest, according to the agreement. As to interest on the excess contribution of machinery, the joint venture agreement would not need to provide for interest, because the excess machinery was to be paid for in full on January 1, 1969 (only two months after the execution of the agreement).

The general rule is that interest on contributions of partnership assets is not allowable, in the absence of a written agreement to the contrary, until a "balance has been struck," but that interest may be charged in a particular case if the equities require. See *Wolf v. Murrane,* 199 N.W.2d 90, 100 (Iowa 1972). We conclude that a requirement for payment of interest on these advances is clearly implied from the terms of the agreement. In addition, we find the equities of this case make it appropriate to grant Randolph interest on them. Under the joint venture agreement, if he had not financed the operations, they would have had to rely upon bank financing, at bank rates. This holding is consistent with the substantive law of partnership. *See Coldren v. Clark,* 93 Iowa 352, 372–3, 61 N.W. 1045, 1050 (1895) (interest allowed to

partner advancing money to pay firm obligations) and *Tacke v. Jennewein,* 228 Iowa 701, 704–5, 293 N.W. 23, 24 (1940) (excess capital contributed by one party must be repaid before distribution of assets to the other, and is treated as a partnership debt).

We hold that interest should be paid on the inventory and operating capital from November 1, 1968, to the date of termination, December 31, 1970, and upon the machinery from January 1, 1969, to the date of termination, all at the rate of five per cent per annum. Interest on the $20,000 cash contribution of Randolph was intended by the agreement to draw interest at the "current bank rate." Evidence as to this rate showed it fluctuated during the period of the venture. It should be paid at the rate of eight per cent from November 1, 1968, to December 31, 1970.

The principal amounts upon which interest shall be computed are: $60,240 (one-half Randolph's excess inventory contribution); $18,627.50 (one-half machinery difference); and $10,000 (one-half cash contribution).

## B.  Allocations of expense items.

The report of the special master made allocations of certain expenses as to joint venture, to Randolph, or to Schrecks, based upon the data available to him. Schrecks take issue with several of them.

They first complain that one-half of the $36,678.72 interest paid by the venture should not be charged to them in the master's report. They claim the joint venture agreement is ambiguous as to all interest; that it should be construed strictly against Randolph under the same reasoning urged by them as to interest on excess capital contributions discussed above. However, the contract was not ambiguous as to this interest; it was an expense of the venture for operation of it. Whether the operating money was supplied by Randolph, or by the bank, it was contemplated that interest was to be paid by the venture. The agreement provided Randolph would provide the money or the credit; it did not require him to furnish it interest-free. It is not shown in

**381**

the record, nor is it material, whether the money was furnished by Randolph directly or by securing bank loans; the agreement provided for interest in either event "at the current bank rate." This interest was properly paid as a joint venture expense.

Schrecks complain that depreciation on joint venture equipment must be considered, and that failure to do so resulted in reduced joint venture equity for them. Depreciation was in effect considered by the special master, however, because he took the actual sale value of the depreciable assets at the time of termination to determine its value for accounting purposes. He stated that this, in effect, did take into consideration the actual depreciation in value of the assets. To include a separate item for depreciation would be duplication, and none should be included in this accounting.

■ An issue has been raised concerning items treated in the master's report as chargeable to Schrecks, and which they maintain should be "capitalized" or charged to Randolph personally. Included was $13,730.46 for hired labor and $1318.12 for payroll taxes. They complain that the labor was largely for construction of improvements on the land, which remained in the ownership of Randolph under the agreement, and which should be charged to him. Whether the labor was for repairs or capital improvements, however, appears to make little different here. If it was for repairs, it was a joint venture expense under this provision of the agreement:

> All other expenses of repairs and maintenance of buildings, machinery and equipment shall be paid equally by first party and second parties as a venture expense.

If they were capital improvements, this provision appears to control:

> *Additional Improvements and Equipment:*
>
> First party agrees to extend the shed roof 20 feet on the south farm at his expense. Any additional equipment or installations shall be a venture expense.

The agreement also requires that Schrecks "will furnish all necessary labor to properly and effectively conduct the same *at their expense.*" (Emphasis added.)

Schrecks complain that this is unfair because Randolph will keep the improvements as part of his real estate after termination of the joint venture. We do not determine the wisdom or fairness of this agreement, however. Schrecks have made no claim of unconscionability, and it must be borne in mind that most of the improvements, such as a concrete feeding apron, reduced the amount of labor required, which would be a benefit to Schrecks.

■ Randolph advanced money to cover margin losses of the venture. He had been reimbursed in part, but $4333.25 remained unpaid. Schrecks contend the venture should not reimburse these losses because such dealing was not provided for in the agreement. The special master testified, however, that this was a cattle hedging operation, and that a traditional hedge "moves in tandem" with the live market. Any margin loss would be offset by increased value of the live cattle on hand. He testified hedging was good business and a justified expense for the venture. We conclude the margin losses paid for by Randolph should be reimbursed in this accounting.

■ Schrecks claim they should be paid for their labor performed "outside" the agreement. They contend that they should be given credit for 2321 hours at $3.00 per hour. In addition, they testified that $3144 in hired labor and employment taxes on it were paid by them. These items of labor were for construction of capital improvements, which would be venture expenses, as discussed previously, rather than part of Schrecks' duty to furnish labor for the regular farming operation. Because it is a venture expense, Schrecks should be reimbursed by the venture for the full amount of $10,107. This is an indebtedness of the venture to Schrecks.

### C. Other adjustments.

■ Another matter involves the matter of Randolph's withdrawals of $47,279.36 during the early operation of the joint ven-

ture. It does not appear in the record when the withdrawals were made; however, all were made before January 1, 1969. It does not appear to be disputed that this should be deducted from his share on distribution, but neither party has raised the matter of interest on that amount. Schrecks have been charged with interest on capital which in effect was advanced for them by Randolph. If they had received one-half of the withdrawal made by Randolph, they could have reduced their indebtedness to him, and therefore the interest owed to him. In equity and fairness, therefore, Randolph should be charged with interest at the legal rate of five per cent from at least January 1, 1969 to the date of termination.

■ The master's report when modified and corrected by the record, showed several items, totaling $10,362.27 were paid on behalf of Randolph by the venture. This is amply supported, and should be added to the termination value and deducted from his distributive share. (These included machinery purchase for him at $3141.77, insurance at $925.84 and $993.30 and miscellaneous personal items including telephone and utilities of $5301.36.)

■ In addition to the $4333.25 Randolph expended for the joint venture expense of hedging, the special master's report indicates that he paid another $1641.11 of joint venture expenses with his personal funds. (These include $471.46 for operating costs, $40.92 for repairs, $583.98 for 1970 taxes and $544.75 for that portion of the 1968 personal property tax attributable to the period after November 1, 1968.) These amounts will reduce the termination value, and will be added to his distributive share.

■ The master's report also indicates that $17,881.52 of Schrecks' personal expenses were paid for with venture funds. These amounts will be added to the termination value and deducted from their distributive share. (These include $13,730.41 for hired labor, $1318.12 for payroll taxes and $2832.94 for personal expenses.)

The record does not reveal when the Randolph withdrawal was made nor when the various debts between the venture and the parties were incurred. If the date of the withdrawals can be determined, interest shall accrue from the actual date of withdrawal rather than from January 1, 1969. Similarly, interest shall be awarded from the date each debt was incurred to the date of termination. If any such date cannot be determined, no interest shall be allowed on that debt.

## II. "Living expenses" advanced.

At various times during the life of the joint venture, Randolph made deposits from his personal funds to the accounts of the Schrecks in the sum of $11,000. He also gave a new automobile to each of their wives at Christmas. The status of the $11,000 is now in dispute. Randolph says it is a joint venture obligation, in effect an advance draw; Schrecks say it was a gift and that in any event, if it was a debt originally, it was later forgiven by Randolph. No claim is made by Randolph that the cars were not gifts.

The cash payments were made at times when the venture could not provide an adequate living for the Schrecks, and they were used by them for living expenses. During the approximately two and one-half years of the joint venture, the Schrecks received no other distributions from it. The cash payments made to them were apparently not made from joint venture funds because they were not sufficient.

■ Randolph claims that as between joint venturers, it would not be reasonable to conclude these were gifts. The law requires that in an equity case, proof of the intent of a donor to make a gift must be established by "clear, convincing and satisfactory" evidence, while at law such intent need only be proven by a preponderance of the evidence. *Meredith v. Cockshoot*, 235 Iowa 213, 220, 16 N.W.2d 221, 225 (1944).

■ It is not likely that cash payments between business partners were intended to be anything other than advances against joint venture distribution, but in any event, appellees' evidence of a gift falls short of

being "clear, convincing and satisfactory." Schrecks contend, in the alternative, that if it was a debt to Randolph, it was forgiven by him. Forgiveness of the debt would also be a gift, and subject to the requirement of proof as set out above.

Testimony of the Schrecks furnished the only evidence of forgiveness of the debt. On one occasion, after they had notified Randolph of their intention to terminate the venture, they went to his office to discuss matters pertaining to business. Dennis Schreck testified as follows:

A. We went into his office to discuss, you know, matters of different things.

Q. Excuse me. Who is he?

A. My brother and I.

Q. All right.

A. Different matters, and we—this was one of the subjects that we asked about, about this $11,000 and he says, oh, forget it. He says don't worry about it. We got more important things, or something of this nature.

Randolph denies an intent to forgive the debt, claiming that it was only an advance to be paid eventually out of profits.

The trial court concluded it was either a gift, or if a debt, that it was forgiven. In this equity case, we are not bound by its findings, although we give weight to them. Even accorded such weight, however, we conclude the evidence of forgiveness of debt also falls short of establishing intent to make a gift and that these amounts should be considered advances against joint venture distributions to the Schrecks. Computation of interest on these advances has been made, from the time they were made until date of termination of the joint venture on December 31, 1970, and the total is $490.26. Randolph shall therefore receive credit on distribution for $11,490.26.

### III. Forfeiture of real estate contract.

On June 12, 1970, the parties entered into a real estate contract under which Randolph agreed to convey to the Schrecks 280 acres of land in Guthrie County for a total price of $56,000. A down payment of $1000 was made on the contract date, and an additional payment of $15,000 was to be made on or before March 1, 1971. This payment was not made and on March 17, 1971, the buyers were served with a notice of forfeiture under chapter 656, The Code, reciting the payment failure and stating that unless the default was cured by payment of the amount due within 30 days the contract would be forfeited. The default was not cured, and on April 4, 1971, a three-day notice to quit was served on the Schrecks. On April 17, 1971, Randolph sold the farm to Merle D. Jensen for the same price and under the same terms as under the Schreck contract. (Jensen was the successor to Schreck in the joint venture enterprise with Randolph.)

Schrecks contend on appeal that the forfeiture proceedings were invalid in that they denied them due process and equal protection under the constitutions of the United States and Iowa. The trial court held the Schrecks had waived any constitutional challenge by signing the sales contract, which contained a forfeiture clause as follows:

*Forfeiture* and *foreclosure.* If Buyers fail to perform this agreement in any respect, time being made the essence of this agreement, then Sellers may forfeit this contract as provided in Chapter 656 of the Iowa Code and all payments made and improvements made on said premises shall be forfeited; or Sellers may declare the full balance owing due and payable and proceed by suit at law or in equity to foreclose this contract, in which event Buyers agree to pay costs and attorney fees and any other expenses incurred by Seller.

Schrecks raised the issue of deprivation of due process, but did not raise the issue of equal protection in their pleadings. The trial court did not decide the issue of constitutionality in its decree, holding only that the Schrecks had waived any constitutional argument by signing the contract. The issue of claimed denial of equal protection was, therefore, not raised nor decided by

the trial court, and as to this issue Schrecks have preserved nothing for review. We limit our consideration of constitutionality to their due process argument. *See Chicago Title Ins. Co. v. Huff*, 256 N.W.2d 17, 20–1 (Iowa 1977).

Schrecks do not contend they were not in default nor that Randolph did not comply with the statutory requirements for forfeiture. They contend only that the contract provision for forfeiture was "invalid and unconscionable." The claim of invalidity is based upon constitutional considerations; the claim of unconscionability is based upon the fact they had paid $1000 down on the contract and had made $1914.79 worth of improvements upon the property. They claim they could not be deemed to have waived the defenses as the trial court held. We do not decide the issue of waiver.

Statutory proceedings for forfeiture of a real estate contract provide the only means for a vendor to enforce its provisions, according to § 656.1, The Code (1971). Section 656.2 provided the method in the following language:

Such forfeiture and cancellation shall be initiated by the vendor where by the successor in interest, by serving or causing to be served on vendee or successor in interest, if known to the vendor or his successor in interest, and on the party in possession of said real estate, a written notice which shall:

1. Reasonably identify said contract and accurately describe the real estate covered thereby.

2. Specify the terms and conditions of said contract which have not been complied with.

3. Notify said party that said contract will stand forfeited and cancelled unless said party within 30 days after the completed service of said notice performed the terms and conditions in default, and, in addition, pays the reasonable costs of serving the notice.

Section 656.3 provided that this notice shall be served personally, or by publication, in the same manner as is provided for service of original notice (at that time governed by Rule of Civil Procedure 56(a)).

The purpose of this chapter is to limit the rights of a forfeiting vendor who might otherwise summarily remove a vendee upon default. It is designed to extend "a little grace to a party in default who may be staggering under the load of his undertaking." *Hampton Farmers Coop. Co. v. Fehd*, 257 Iowa 555, 560, 133 N.W.2d 872, 875 (1965), quoting from *Waters v. Pearson*, 163 Iowa 391, 397, 144 N.W. 1026, 1029 (1914). It is, therefore, a statute enacted to limit the forfeiture rights of a contract vendor, not to grant any powers of the vendor, or the state, to deprive a vendee of a property interest.

Schrecks contend, however, that:

[t]his statutory method which enables private claimants to deprive a person of property interest without any opportunity for a hearing is in direct conflict with the due process of the 14th Amendment to the Constitution of the United States of America.

It should be noted that the Fourteenth Amendment provides that "nor shall any *State* deprive any person of . . . property, without due process of law . . ." (Emphasis added.) Article 1, § 9 of the Iowa Constitution provides that "no person shall be deprived of . . . property, without due process of law." This provision is a limitation only on state action; it does not refer to individual activity. *See* 16 Am.Jur.2d Constitutional Law §§ 17, 542; *Davenport Water Co. v. Iowa State Commerce Commission*, 190 N.W.2d 583, 593 (Iowa 1971).

A threshold question in a Fourteenth Amendment challenge is whether state action is involved, or whether a person has acted under color of state law in his actions. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45, 50 (1961) (equal protection). *Howe v. United Parcel Serv., Inc.*, 379 F.Supp. 667 (S.D.Iowa 1974) involved the applicability of the Fourteenth Amendment to hair-length rules of the defendant corporation. Five bases for finding state action

are discussed. These include: (1) where a state acts directly through its officer or agent; (2) where the state acts in conjunction with business in a profit-making field; (3) where the state by its actions (or inaction) encourages or creates an atmosphere in which private citizens deprive others of their constitutional rights; (4) where the state affirmatively orders or approves the action in the course of its regulatory rule-making; and (5) where functions traditionally performed by the state are delegated to or performed by private interests. 379 F.Supp. at 670.

Schrecks' due process argument as to state involvement is that if Randolph followed the statutory forfeiture procedures, § 656.5 "provides the Seller with what appears to be marketable title," and that "the court's action in enforcement of the contract and completion of the divestiture without a hearing for Buyer is sufficient state action."

It is clear that the State of Iowa has not been directly involved in the process even though as Schrecks point out, the sheriff served the notice of forfeiture and subsequent notice to quit. If this constituted state action, every lawsuit commenced by a sheriff-served original notice, and the proceedings following would be state actions. Furthermore, service of notice is not even intended to be "state action." Rule of Civil Procedure 52 (in effect at time of service) provided service could be made by any person not a party to the action nor an attorney for the party. It need not be served by a sheriff or any other law enforcement officer.

Clearly four of the five tests discussed in *Howe* are not applicable here to establish state action. The "encouragement" test, number (3) above, would appear to be a possible basis for concluding state action is involved. Concerning the "encouragement" test, *Howe* discusses two cases, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

*Adickes* involved a suit by a white woman against a store. She had taken her black students to the restaurant area of the store. The students were served but she was not pursuant to a local custom of refusing service to "Caucasian[s] in the company of Negroes." Immediately upon leaving the store, she was arrested by police on a charge of vagrancy. There was no question about the discriminatory arrest. However, in order to sue the restaurant under the federal statutes, it was necessary to find that there was state action in the restaurant's refusing service. The waitress clearly was not a state official. Therefore, the theory was created that the arrest was made in encouragement of the custom of not serving whites and blacks together. It is this encouragement which satisfies the state action requirement.

*Reitman* involved an amendment by referendum to the California constitution. In reaction to state anti-discrimination in housing legislation, Proposition 14 was approved providing:

> Neither the State nor any subdivision . . . thereof shall deny . . . the right of any person . . . to decline to sell, lease or rent such property to such person or persons as he, in his absolute discretion, chooses.

The proponents of the amendment tried to avoid the state action argument by styling the amendment as "neutral;" it did not itself effectuate racial discrimination but only provided that the state would not interfere with private racial discrimination. The argument was rejected by the court. They determined that in the existing California environment the effect of the amendment would be to encourage and foster racial discrimination. This encouragement served to involve the state in the subsequent racial discrimination, fulfilling the state action requirement.

The *Adickes* and *Reitman* cases are distinguishable from the contract case involved here. They involve more direct state involvement, i. e., police arrest and a constitutional prohibition of anti-discrimination legislation. Furthermore, they in-

volve matters of racial discrimination as opposed to a property right, and as stated in *Howe* a "double standard" exists for determining state involvement. The court said:

[R]acial discrimination is so offensive that the government shall in no way be implicated in it and judicial scrutiny of state involvement may not be as strict as [sic] in [a] situation involving less offensive conduct.

379 F.Supp. at 674. The test as stated in *Reitman* is "weighing and sifting" in each case. The court there said:

This court has never attempted the "impossible task" of formulating an infallible test for determining whether the State "in any of its manifestations" has become significantly involved in private discriminations. "Only by sifting facts and weighing circumstances" on a case-by-case basis can a "nonobvious involvement of the State in private conduct be attributed its true significance."

387 U.S. at 378, 87 S.Ct. at 1632–3.

■ The facts and circumstances to be considered here, in applying this test would include these: (1) The statute protects the buyer. When it was enacted in 1897 it had the effect of limiting an otherwise valid contractual right; it did not create or expand the rights of forfeiture. *See Hampton Farmers Co-op. Co. v. Fehd*, 257 Iowa 555, 560, 133 N.W.2d 872, 875 (1965). (2) The chapter is "construed strictly as against the forfeiture, and with liberality towards those opposing it. One seeking [a forfeiture as to land contracts must] fully and strictly follow the procedure required therein." *Kilpatrick v. Smith*, 236 Iowa 584, 593, 19 N.W.2d 699, 703 (1945). (3) It might be argued that failure to outlaw forfeiture provisions would supply state action. However, a land sale contract with a forfeiture provision is a viable alternative to a mortgage. As stated in the *Hampton Farmers Co-op.* case, 257 Iowa at 560, 133 N.W.2d at 874–5:

From the vendors' standpoint forfeiture presents a swift and inexpensive remedy in the event of a default. A vendee can live with such remedy to obtain the ad-

vantages of an installment contract and the usual low down payments when other financing could not be obtained.

Therefore, it is reasonable for the legislature to retain the use of a forfeiture clause, and by placing some limits upon a vendor's use of it, as had been done in chapter 656, The Code, the vendee is given reasonable protection.

■ The state, in this balancing process has not affirmatively caused or even encouraged forfeitures. It has merely said that certain protections must be provided a vendee if forfeiture is sought. It has neither mandated nor prohibited forfeitures, but has assumed a "neutral" role. As stated in *Howe* "[n]eutrality is permissible." 379 F.Supp. at 672.

We conclude that under the facts and circumstances in this case, there was not state action sufficient to raise issues of due process.

Schrecks rely upon *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) and *Thorp Credit, Inc. v. Barr*, 200 N.W.2d 535 (Iowa 1972) as authority for their claim that chapter 656 violates their 14th Amendment rights because no hearing was afforded prior to forfeiture. We need not consider the authority of these cases, however, because of our holding of no state action. In any event, we perceive significant distinctions between the state statutes in *Fuentes* and *Thorp*, providing for summary repossession of personal property without notice or hearing, and the provisions of chapter 656 which grant a 30-day notice to a defaulting vendee and the opportunity to cure the default.

The vendees here, in an apparent claim of unjust enrichment, also claim the court's action in "enforcing" the forfeiture provisions is "unconscionable" for two reasons: (1) it results in the loss of their contract rights, as well as their $1000 down-payment and $1914.79 in improvements; and (2) the reason they had not paid the $15,000 installment was that Randolph had wrongfully withheld an accounting and distribution to them, and they were therefore unable to pay it.

As to the first ground of unconscionability, this court has permitted retention of liquidated damages if they are not out of reasonable proportion to the loss or injury actually sustained or reasonably anticipated. *See Engel v. Vernon*, 215 N.W.2d 506, 516 (Iowa 1974) (liquidated damages provision of covenant not to compete).

The Indiana case of *Skendzel v. Marshall*, 261 Ind. 226, 233, 301 N.E.2d 641, 645 (1973) concerned a real estate forfeiture provision similar to Iowa's. The court approved the following quotation from 6 A.L.R.2d 1401, 1405 (1949):

On the other hand, if the amount of the payments received by the vendor at the time the purchase was abandoned represents but a small percentage of the total purchase price, and if the purchaser's breach occurred soon after the execution of the agreement (and particularly if the circumstances indicate that a purchase is made for speculative purposes or the breach represented an effort . . . to escape an unfortunate turn in the market), the courts tend to hold that the forfeiture clause was one for liquidated damages, with the result that the purchaser cannot recover back the payments made.

Of the total purchase price of $56,000, Schrecks had paid only $1000 down on it, and provided improvements worth $1914.79. The amount forfeited is not unreasonable under the circumstances nor so out of proportion to losses reasonably anticipated to constitute a penalty. *Engel v. Vernon, supra*, 215 N.W.2d at p. 516. *See also Miller v. American Wonderlands, Inc.*, 275 N.W.2d 399 (Iowa 1979) (opinion filed February 21, 1979).

Schrecks contend Randolph withheld joint venture distributions, and this is the reason they were unable to make the payment due March 1, 1971. However, the contract was not executed until June 12, 1970, after they had orally notified Randolph of their intention to terminate the venture as of December 31, 1970. They knew as of that time that the venture was unsuccessful financially and they had drawn no money from it except Randolph's advances to them, then in the total amount of $8000. There is no evidence that any serious attempts had been made to force an accounting or distribution of venture earnings within the 30-day period provided for curing the default, or at any time after execution of the contract. Schrecks implied that Randolph forced the default in this manner so as to retain ownership and sell it again at a profit. The record shows, however, that it was resold upon default for the same price and under the same terms as in the Schreck contract. The only financial gain to Randolph in the exchange of buyers was the $2914.79 retained from Schrecks, and it is doubtful that this was all profit.

We conclude the contract forfeiture was not invalid upon grounds of due process denial nor of "unconscionability." We therefore affirm the decree of the trial court as to this matter.

## IV. Disposition of the case.

An insufficient record precludes us from final disposition of this case, despite our de novo scope of review. One of the most troubling factors is the value of the joint venture at its termination date. This is crucial to the accounting. The special master's report indicates a value of $147,301.37 while the final joint venture income tax return indicates a value of "partners' capital accounts" of $211,678.49. In addition, it is not shown in what form the assets now exist, in whose custody they are, or whether if an account receivable or contract, interest is payable on it, and if so, how much. There is also the matter of a possible 1970 withdrawal of $42,490.58 which is indicated on the tax return but as to which the master's report is silent. Interest should be computed on some items as above directed. These matters must be determined by the trial court upon a limited record to be made upon remand, much as in the same manner as ordered by this court in *Wolf v. Murrane*, 199 N.W.2d 90, 101 (Iowa 1972), with the assistance of a master, if ordered by the trial court.

■ Once these determinations are made, the accounting may be completed. The starting point is the value, to be determined upon remand, of the assets on January 1, 1971. The following adjustments should be made:

(a) The amount of withdrawals, plus interest as herein provided, shall be added (Randolph: $47,279.36 plus interest at the legal rate from January 1, 1969 through the termination date, December 31, 1970; Schrecks: $11,000 plus $490.26 interest; the 1970 draw, if any, will be charged to the appropriate party, with interest at the legal rate from the date of the withdrawal to the termination date.);

(b) The amount of the indebtedness of each party to the venture, without interest, shall be added;

(c) The indebtedness of the venture to third parties shall be subtracted;

(d) The indebtedness of the venture to the joint venture parties shall be subtracted;

(e) The fees and costs of any special master previously or subsequently appointed by the court shall be subtracted from the termination value as a venture expense. *Wolf v. Murrane,* 199 N.W.2d at 101.

■ The resulting "adjusted termination value" shall be divided equally between these parties to provide a preliminary distributive share. Each party's share shall be augmented and reduced in accordance with this opinion to determine the ultimate distributive share. Each share shall:

(a) be increased by the amount which the joint venture owes that party (satisfaction of venture expenses with personal funds);

(b) be decreased by the amount owed to the joint venture by that party (withdrawals as well as other indebtedness);

(c) finally, Schrecks' share shall be decreased and Randolph's increased by the amount, with interest, found to be owed on account of Randolph's excess contributions to capital.

The decree of the trial court is affirmed as to division I of Schrecks' first amendment to its cross-petition, seeking relief as to the forfeiture of the contract, and that division is dismissed.

The decree of the trial court granting Randolph judgment of $3000 on the account and $1914.79 on the forfeited land sale contract is affirmed.

The decree as it relates to the accounting between the parties is modified and remanded for further proceedings in conformity with this opinion.

Affirmed in part, modified in part and remanded.