Joe PAGLIA, Appellant,

v.

Gladys ELLIOTT, a/k/a Gladys C. Elliott and Gladys Cherry Elliott; Alice E. Tesar; Richard G. Tesar; and Tama County, Iowa, Appellees.

No. 84–1513.

Supreme Court of Iowa.

Aug. 21, 1985.

Marie A. Condon, Marshalltown, for appellant.

William Dennis Currell of Hall & Irvine, Cedar Rapids, for appellee Elliott.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, McGIVERIN, and WOLLE, JJ.

UHLENHOPP, Justice.

This appeal of an action to foreclose a real estate mortgage involves the Iowa Consumer Credit Code (ICCC), which is chapter 537 of the Iowa Code of 1979, and the federal Truth in Lending Act (TLA), which in turn constitutes chapter 41, title 15, United States Code of 1976. References are to those Codes.

We review de novo. Iowa Code § 654.1 (1983); *Freese Leasing, Inc. v. Union Trust & Savings Bank*, 253 N.W.2d 921, 924 (Iowa 1977).

Defendant Gladys C. Elliott, a widow seventy years of age at the time of the transactions in question, lived in the Cherry mansion in Tama, Iowa. The home had a

monthly upkeep of $4000. Two grandsons lived with her, Derb Cherry and Jeff Wheeler.

The grandsons spent large sums of money. To maintain their cash flow they became acquainted with plaintiff Joe Paglia, a pawnbroker in Marshalltown, Iowa. They had numerous transactions with him in the nature of pawns. Additionally, Wheeler owned a bar and Paglia owned a coin-operated game company, and Paglia had one of his game machines in the bar and occasionally lent money to Wheeler from the machine.

Richard Joe Tasler was a business associate and longtime friend of Paglia, and the grandsons came to know him also. Tasler had various businesses including wholesaling jewelry out of his home and operating a car lot where the grandsons bought several automobiles.

In time the grandsons accumulated a debt of about $25,000 to Tasler. They brought him their grandmother's furs, crystal, antique silver, and similar items, and exchanged them for cash. Mrs. Elliott was aware of this and desired to reacquire her items from Tasler.

Paglia offered to lend Mrs. Elliott $80,-000. In consideration of the loan, Mrs. Elliott would convey her home to him with an option to buy it back. Pursuant to the proposal, Paglia consulted the law firm of Fairall, Fairall, Reeves & Kaplan. Charles F. Fairall had done work for Paglia before, primarily as a scrivener. The firm had also done substantial legal work for Mrs. Elliott and the grandsons, including a divorce and the sale of a bar for one of the grandsons, criminal and numerous traffic charges for the other grandson, and a lawsuit against a bank for Mrs. Elliott.

Fairall drafted the papers as Paglia directed. When the parties assembled, however, Fairall withdrew them from Mrs. Elliott, stating that she should not sign them.

Subsequently two mortgage transactions occurred. On August 9, 1980, Mrs. Elliott executed a note and mortgage to Paglia in the amount of $19,000. Of this amount, $15,000 went to Mrs. Elliott and $4000 went to one of the grandsons. Later, on December 29, 1980, Mrs. Elliott executed a demand note and a real estate mortgage to Paglia in the amount of $55,000 at twenty-four percent interest. This transaction was negotiated by Paglia and one of the grandsons, and the documents were prepared by Marie A. Condon, then a member of the Fairall firm. The proceeds of the loan were allegedly disbursed as follows. Paglia issued his check for $25,000 to Mrs. Elliott and Tasler, and they endorsed it. This check was to pay the grandsons' debts to Tasler. Apparently, however, Paglia did not have sufficient funds to cover the check. According to the testimony, Tasler returned the check to Paglia in exchange for Paglia's note for $27,000. This alleged note was not presented at trial. Some of Mrs. Elliott's furs and antiques were returned to her.

Nineteen thousand dollars of the loan were applied to retire the mortgage previously executed by Mrs. Elliott. Six thousand dollars went to Derb Cherry. The remaining five thousand dollars were paid to Mrs. Elliott. Paglia never gave Mrs. Elliott a three-day notice of right to rescind in connection with this note and mortgage.

Mrs. Elliott made payments on the note, but the actual amounts are in dispute. The trial court found the total amount to be $21,400, based on a hand-written account kept by Mrs. Elliott. Paglia contends the actual amount is $16,500, based on bank receipts.

During the series of transactions Mrs. Elliott received about $90,000 from the sale of oil interests.

Mrs. Elliott became in default on the second note and mortgage, and on July 12, 1982, Paglia instituted the instant foreclosure proceeding against her. She answered and counterclaimed, alleging violations of ICCC and TLA. On May 2, 1983, she served notice of her intention to rescind the note and mortgage. At some point she sold part of her real estate.

After trial, the trial court applied ICCC and TLA to the case and granted relief

under those acts. As we understand the final decision, the court decreed: (1) Paglia cannot recover from Mrs. Elliott, as unconscionable, the sum of $25,000 which he allegedly paid Tasler on the grandsons' obligations; (2) the balance of Mrs. Elliott's second note and mortgage is rescinded in the following way: within twenty days from the decision Paglia must pay Mrs. Elliott the amount she paid him, found by the court to be $21,400, and within ten days thereafter Mrs. Elliott must pay Paglia the amount she received from him ($15,000 under the first note and $5000 under the second one); (3) Mrs. Elliott is to recover from Paglia a penalty of $500 and her attorney fees of $6881.38; and (4) Paglia is to pay the court costs. Paglia appealed.

Paglia asserts several propositions in the appeal: (1) ICCC and TLA are not applicable; (2) Mrs. Elliott should not be allowed to rescind; (3) she paid Paglia only $16,500, not $21,400; (4) the part of the transaction relating to $25,000 is not unconscionable; and (5) Paglia is not liable for a penalty, attorney fees, or costs. An issue also exists relative to the validity of Paglia's notice of appeal.

I. *ICCC and TLA.* The first issue is whether the note and mortgage in suit fall within ICCC and TLA.

A. As to ICCC, a "consumer loan" is defined thus in section 537.1401(14)(a) of the Iowa Code:

a. Except as provided in paragraph "b", a "consumer loan" is a loan in which all of the following are applicable:

(1) The person is regularly engaged in the business of making loans.

(2) The debtor is a person other than an organization.

(3) The debt is incurred primarily for a personal, family, household or agricultural purpose.

(4) Either the debt is payable in installments or a finance charge is made.

(5) Either the amount financed does not exceed thirty-five thousand dollars, or the debt is not incurred primarily for an agricultural purpose and is secured by an interest in land.

Paglia contends that the transaction does not come within paragraphs 1 and 5. Taking paragraph 5 first, Paglia cites *Farmer's Trust & Savings Bank v. Manning,* 311 N.W.2d 285 (Iowa 1981). That case concerned a transaction which occurred prior to 1977, and we noted in the opinion that the law subsequently changed. *Id.* at 290. The amended statutory language does change the result, and the cited case is inapposite.

Paragraph 5 in the 1979 Code contains two clauses, either of which will make the paragraph applicable. The second clause states: "[T]he debt is not incurred primarily for an agricultural purpose and is secured by an interest in land." In this case the testimony at trial disclosed that the monies were used for personal reasons, not for business or agriculture. In addition, the loan was secured by an interest in land. Paragraph 5 therefore applies.

Paragraph 1 of section 537.1401(14)(a) requires that the person be regularly engaged in the business of making loans. At this point Paglia injects his status as a pawnbroker into the argument, and he cites section 537.1202 of ICCC which provides in pertinent part:

This chapter does not apply to:

. . .

5. Pawnbrokers who are licensed and whose rates and charges are regulated under or pursuant to ordinances of cities or statutes of this state. . . .

We will assume arguendo that Paglia as a pawnbroker comes within this provision.

■ Paglia's argument raises two distinct issues: whether Paglia made the present loan as a pawnbroker and if not, whether Paglia's business as a pawnbroker may nonetheless be considered, along with his other lending activities, on the factual question of whether he was "in the business of making loans."

As to the first of these issues, the evidence is clear that Paglia did not make the instant loan as a pawnbroker. The trans-

action is therefore not excluded from the operation of ICCC on that account.

As to the second issue, in determining the factual question of whether Paglia was in the business of making loans we think that all of his money-lending activities are relevant. The evidence indicates that money lending in various ways was a substantial part, if not the main part, of his business activities. While according to the evidence he had made only four loans of the type we have here, he also made loans to bar owners against their shares of the coins that were in Paglia's coin machines at their bars. In addition, he made about one hundred loans per month in his pawn shop. A pawn is essentially a loan. "A pawnbroker has been defined as a person who makes a business or occupation of lending money at interest on the security of personal property deposited in his keeping." 70 C.J.S. *Pawnbroker* § 1, at 186 (1951). Taken altogether, we find that Paglia's lending activities add up to the business of making loans. The requirements of paragraph 1 of section 537.1401(14)(a) are thus met. We hold that the transaction in question is a consumer loan under ICCC, and approve the trial court's conclusion.

B. As to TLA, Paglia advances two contentions:

■ 1. He first maintains that because of his pawnbroker status the act does not apply. We can find no indication of such an exemption in the act. The staff of the Federal Reserve Board stated in Staff Letter No. 419 C.C.G. (CCH) ¶ 30,066 (June 26, 1970):

It is the opinion of the Board's staff, as well as the staff of the Truth in Lending section of the Federal Trade Commission, that pawn shops do fall under the provisions of the Act.

A federal appeals court stated in *Bright v. Ball Memorial Hospital Ass'n, Inc.*, 616 F.2d 328, 333 (7th Cir.1980) (citation omitted):

[W]hile Federal Reserve Board interpretive regulations and staff opinion letters are not binding upon the courts, these constructions of the statutes and

the Board regulations are entitled to substantial deference "because of the important interpretive powers granted to the agency in this very complex field."

We hold that Paglia is not exempt from TLA on the basis of his pawnbroker status.

2. The second question on this part of the case is whether Paglia is within the definition of "creditor" in TLA. The law has changed since the time of the transaction which gave rise to this suit. We therefore apply the regulations under Regulation Z in effect when Paglia obtained this note and mortgage.

A "creditor" is defined as follows in the pertinent part of title 15 of the United States Code, section 1602(f):

The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required; and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

The regulations essentially restate this definition in 12 C.F.R. 226(a)(12).

■ The only issue under these laws is whether Paglia "regularly extends" credit. In subsequently promulgated regulations effective April 1, 1981, footnote 2 to section 226.2(a)(17) states that a lender is said to extend credit regularly "only if it extended credit more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year." While the new regulations do not apply to the situation at hand, they give some clue as to the meaning of "regularly extends ... credit." As Paglia received about a hundred pawns per month, we hold he regularly extended credit. We approve the conclusion of the trial court that TLA applies.

II. *Rescission.* Mrs. Elliott contended at trial, and the trial court held, that she was entitled to rescind the transaction at the time she endeavored to do so, because at the time of the transaction itself Paglia did not give her the three-day notice of her right to rescind. *See* 15 U.S.C. § 1635; 12 C.F.R. § 226.9(h). Subsection (f) of section 1635 contains a three-year time limit to rescind in cases in which the required three-day notice was not given. The transaction took place on December 29, 1980. On May 2, 1983, Mrs. Elliott served Paglia with her notice to rescind. The notice was thus timely.

Paglia contends that Mrs. Elliott's right to rescind expired when she sold part of the property. *See* 15 U.S.C. § 1635(f). Assuming that this part of paragraph (f) applies to a loan transaction, paragraph (h) of regulation 226.9 requires that to be disqualified for rescission the customer must transfer all of his or her interest. We construe paragraph (h) to mean all of his or her interest quantitively as well as all of it as to legal rights in the property.

We thus reject Paglia's contentions and hold that rescission is proper in this case. The mechanics for rescission, applied by the trial court, are set forth in 12 C.F.R. 226.9(d).

III. *Payments.* Paglia argues that Mrs. Elliott paid no more than $16,500 on the note and mortgage, and that we should so find. The trial court found that she paid $21,400.

The record is confusing on this fact question. The determination must rest primarily on judging the credibility of each of the two main witnesses. The trial court's finding has substantial evidentiary support and, although the record would permit us to find otherwise, we are reluctant to do so. Trial judges are in a better position than we to pass upon the credibility of witnesses. *See In Re Marriage of Vrban,* 359 N.W.2d 423 (Iowa 1984). We therefore uphold the trial court's finding as to payments.

IV. *Unconscionability.* Paglia asserts that the portion of the debt which was set aside by the trial court, $25,000, was not unconscionable. Again much depends on credibility of the witnesses and the weight of their testimony. On this issue the rule is especially applicable that, although we are not bound by the trial court's fact findings, we give them weight. Iowa R.Civ.P. 14(f)(7).

Section 537.5108 of ICCC deals with the subject of unconscionability. Paragraph 4 sets forth criteria. Paraphrased, these are: belief by the lender that the debtor cannot repay the debt; knowledge by the lender that the debtor will not derive substantial benefit from the property or services; gross disparity between value and price of the item; separate charges in the purchase of insurance with respect to a consumer credit sale or loan with the effect of making the loan, as a whole, unconscionable; overreaching a physically or mentally infirm consumer; and conduct which would likely be restrained by a court. *See also Home Federal Savings & Loan Ass'n v. Campney,* 357 N.W.2d 613, 618 (Iowa 1984) (other indicia of unconscionability include "factors of assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness").

Upon review of the evidence, we find ourselves in complete agreement with the trial court that this transaction, as to the item of $25,000 at least, was unconscionable. The case presents a classic illustration of two grandsons who were fleecing their grandmother, and of two outsiders, fully aware of the circumstances, who participated in bringing about the grandmother's financial downfall. In our opinion this is the kind of case the unconscionability provisions of ICCC were intended to reach. We uphold the trial court's decision on the issue. We make no attempt to sort out the rights and liabilities, if any, that Paglia, Tasler, Cherry, and Wheeler may have inter se.

V. *Penalty, attorney fees, costs.* Mrs. Elliott is entitled to a penalty, attorney fees, and district court costs, pursuant to

subsections (1) and (8) of section 537.5201 of the Iowa Code. By the same token, Paglia is not entitled to attorney fees. § 537.2507. We uphold the judgment in this regard.

VI. *Jurisdiction.* We reject Mrs. Elliott's contention that this court does not have jurisdiction of the appeal.

We have considered each of Paglia's other arguments in the appeal but find them without merit. As to rescission, Paglia has twenty days from the date of procedendo in which to pay Mrs. Elliott $1400 (difference between $21,400 and $20,000).

We assess the appeal costs to Paglia.

AFFIRMED.