# IN THESUPREME COURT OF IOWA

No. 18 / 04-1653

Filed March 5, 2007

**MIDWEST CHECK CASHING, INC.,
d/b/a EZ MONEY CHECK CASHING,**

Appellee,

vs.

**ERIN E. RICHEY,**

Appellant.

Appeal from the Iowa District Court for Polk County, Robert J. Blink, Judge.

Defendant seeks discretionary review of a decision by the district court that affirmed a judgment entered by a magistrate in an action to collect a "payday" loan. **AFFIRMED.**

Carlton G. Salmons and Tom W. George of Gaudineer, Comito & George, West Des Moines, for appellant.

Hugh J. Cain of Hopkins and Huebner, P.C., Des Moines, for appellee.

**CADY, Justice.**

In this discretionary review from a decision by the district court that affirmed a judgment entered by a magistrate in an action by a delayed deposit services business to collect a "payday" loan, we must determine if the applicable statutory requirements were followed in the case and whether the "payday" loan statute is constitutional. On our review, we affirm the judgment of the district court.

**I.      Background Facts and Proceedings.**

Erin E. Richey (Richey) obtained a $400 loan from Midwest Check Cashing, Inc. (Midwest) in March of 2002. Midwest is a business engaged in delayed deposit services, which provides customers with what is commonly known as "payday" loans. Midwest is licensed to operate the business by the State superintendent of banking. Richey had obtained similar loans in the past from Midwest when she resided at 1228 East 13th Street in Des Moines. At the time of this transaction in March 2002, however, Richey resided at 712 13th Street in West Des Moines.

As a previous customer, Richey was familiar with the "payday" loan process. Under this process, the customer gives a postdated personal check made payable to the business engaged in delayed deposit services in return for the receipt of cash. The amount of the check is greater than the amount of cash the customer immediately receives from the company. The difference in the two amounts represents the transactional fee charged by the company for giving the customer the cash in advance of negotiating the check. In this case, Richey made a check payable to Midwest for $450, postdated it two weeks into the future, and immediately received $400 from Midwest. Midwest, of

course, agreed to wait two weeks before cashing the check. At this time, Richey would presumably have enough money in her account to honor the check. The "payday" loan allows a customer with a checking account to obtain money by writing a check without adequate funds in the checking account at the time the check is written.

The check given to Midwest by Richey accurately reflected the address of her current West Des Moines residence. However, Richey also signed a disclosure agreement as a part of the transaction. The agreement disclosed Midwest loaned Richey $400 and imposed a $50 fee for the transaction. It also disclosed this $50 fee represented the equivalent of a 325.89% annual percentage rate (APR) on the $400 loan over two weeks. Finally, the agreement erroneously indicated Richey's current address as her former Des Moines residence, but included an acknowledgement that "all statements made in this agreement are true, complete, and correct." Nevertheless, Richey signed the agreement.

Midwest negotiated Richey's check two weeks after the transaction by depositing it in its bank account. The check was not paid because of insufficient funds in Richey's checking account. As a result, Midwest sent Richey a letter of notice to cure default. The letter was sent to her previous Des Moines address shown on the disclosure agreement.

Midwest brought a small claims action to collect the debt after Richey failed to respond to the notice to cure. Richey eventually filed an answer and counterclaim in the action. The counterclaim sought damages and attorney fees based in part on Richey's claim that she did not receive the notice to cure mailed by Midwest.

At the small claims hearing, a representative from Midwest explained the procedure followed by the company in a "payday" loan

transaction. In particular, she testified if a check given by a customer shows an address of the customer different from the address in its computer records, then the customer is asked if the address in its records is correct. If the address is not correct, the computer records are then changed to reflect the correct address. In this way, the office records are relied upon by the business to reflect the customer's correct information.

Midwest called Richey as a witness. She testified on direct examination that Midwest never asked her to verify her current address during the transaction. Richey then contradicted herself on cross-examination when she recalled that Midwest did indeed ask her if the address on the check was correct. Yet, on redirect examination, Richey again testified that Midwest never asked about her current address.

Richey further testified she never received the notice to cure, and had no other contact with Midwest regarding the transaction. Richey testified she believed the check she gave to Midwest had been paid.[1]

The small claims court ruled in favor of Midwest and against Richey on her counterclaim. It found Richey failed to provide her correct address to Midwest. Richey appealed to the district court. She claimed the transaction was governed by the Iowa Consumer Credit Code (ICCC), not the Delayed Deposit Services Licensing Act (DDSLA). Richey challenged the constitutionality of the DDSLA, and further challenged the validity of the notice to cure given by Midwest.

---

[1]After writing the $450 check to Midwest, Richey's checks were stolen. The thief wrote over $8000 in fraudulent checks, and as a result, Richey opened a new checking account. Because of the theft, she had considerable confusion regarding her finances and the consequences of the check she wrote to Midwest. She assumed it had cleared because she had not heard from Midwest.

The district court affirmed the judgment. It found the ICCC did not override the more specific provisions of the DDSLA, and as a result the DDSLA governed Richey's transaction. It further found Richey's constitutional challenges to the DDSLA were without merit because Richey could not prove the requisite state action in order to succeed. In addition, the district court noted Richey could not show dissimilar treatment of similarly situated individuals, and even if these prerequisites could be met, the DDSLA was rationally related to the government's interest. Finally, the district court found Richey provided Midwest with an incorrect address by signing the disclosure statement.

Subsequently, Richey applied for discretionary review to the Iowa Supreme Court pursuant to Iowa Code section 631.16 (2005). *See* Iowa R. App. P. 6.201 (stating the requirements for an application for discretionary review). We granted her application.

## II.     Issues.

On appeal, Richey makes two basic arguments. First, the ICCC governs her transaction and the transaction failed to satisfy the ICCC's requirements. Second, if the DDSLA governed her transaction, section 533D.9 of the DDSLA is unconstitutional.

## III.     Standard of Review.

"On discretionary review of a small claims action, our standard of review depends on the nature of the case. If the action is a law case, we review the district judge's ruling on error." *Hyde v. Anania*, 578 N.W.2d 647, 648 (Iowa 1998) (citation omitted). The parties agree Richey's statutory arguments must be reviewed on assigned errors. *See City of Ames v. Regency Builders, Inc.*, 653 N.W.2d 553, 555 (Iowa 2002) (reviewing at law and noting the parties agree). The parties also agree

Richey's constitutional arguments must be reviewed de novo. *See Simonson v. Iowa State Univ.*, 603 N.W.2d 557, 561 (Iowa 1999) ("Our review of a district court's judicial review ruling is ordinarily for correction of errors at law. When constitutional issues are raised, however, we must make an independent evaluation of the totality of the evidence and our review in such cases is de novo." (Citation omitted.)).

### IV. Application of the ICCC to "Payday" Loans.

Richey claims the "payday" loan transaction is governed by the ICCC, and the transaction violated the ICCC in three ways. First, she argues Midwest failed to comply with the notice to cure provisions under the ICCC. Next, Richey argues the disclosure agreement inaccurately stated the interest rate, or at least was deceptive and misleading in stating the interest rate, under the provisions of the ICCC. Last, Richey argues the interest charged is unconscionable and violates the limitations imposed by the ICCC. Thus, we must first decide if the ICCC applies to "payday" loan transactions.

"Payday" loans are specifically governed by the "Delayed Deposit Services Licensing Act." The Iowa legislature enacted the statute in 1995. 1995 Iowa Acts ch. 139, §§ 1–16 (codified as amended in Iowa Code §§ 533D.1–.16 (2007)). The DDSLA specifically applies to licensed delayed deposit service businesses, or "payday" loan companies, and explicitly excludes transactions involving banks, savings and loan associations, credit unions, industrial loan companies licensed under chapter 536A, and any affiliate of these financial organizations. Iowa Code § 533D.16 (recognizing organizations not regulated by chapter 533D). The provisions of the DDSLA clearly governed the transaction between Midwest and Richey in this case.

On the other hand, consumer credit transactions in Iowa have long been governed by the ICCC. The ICCC predates the DDSLA, and governs all consumer credit transactions in Iowa not specifically excluded under the statute. The ICCC specifically applies to "acts, practices or conduct in this state in the solicitation, inducement, negotiation, collection, or enforcement of a transaction, without regard to where it is entered into or modified." *Id.* § 537.1201(1)(*c*). The transaction between Midwest and Richey satisfies this definition. Additionally, the express exclusions under the statute do not include delayed deposit services. *See id.* § 537.1202 (indicating what chapter 537 does not apply to). Under the ICCC, a "payday" loan would normally satisfy the definition of a "consumer loan." *See id.* § 537.1301(14).

Consequently, it is clear the ICCC applies to "payday" loans to the extent the statute does not conflict with the specific provisions of the DDSLA. The ICCC provides that "no part of [the ICCC] shall be deemed to be impliedly repealed by subsequent legislation if such a construction can be *reasonably avoided.*" *Id.* § 537.1104 (emphasis added). The DDSLA was enacted after the ICCC and was passed to govern delayed deposit services. When the provisions of the DDSLA specifically govern the issues in this case and conflict with the provisions in the ICCC, the provisions of the DDSLA must prevail unless such a construction could be reasonably avoided.[2] *Id.* We now apply this principle to Richey's arguments.

---

[2]We note our basic principles of statutory construction also require this result. *See Burton v. Univ. of Iowa Hosps. & Clinics,* 566 N.W.2d 182, 189 (Iowa 1997) (recognizing three principles of statutory construction); *Kelly v. State,* 525 N.W.2d 409, 411–12 (Iowa 1994) ("When a general statute is in conflict with a specific one, the more specific statute generally prevails, irrespective of the time of its enactment. In case of irreconcilable conflict between two statutes, the later one controls.").

Richey argues Midwest failed to properly provide her with a notice to cure default under the ICCC. Both parties agree the DDSLA does not include a notice to cure requirement prior to bringing suit. Thus, the ICCC's notice provisions are not contradicted or impliedly repealed by the DDSLA, and there is no need to "reasonably avoid" applying the DDSLA. *See id.*

Moreover, the ICCC's notice to cure provisions "appl[y] to actions or other proceedings to enforce rights arising from consumer credit transactions." *Id.* § 537.5102. The parties concede this is a consumer credit transaction. *Id.* § 537.1301(12) (defining "consumer credit transaction"). Thus, Midwest must comply with the notice to cure provisions of the ICCC. *See id.* § 537.5110(1) ("[T]he obligation of a consumer in a consumer credit transaction is enforceable by a creditor only after compliance with this section.").

The ICCC requires a creditor to provide a notice to cure to a consumer before bringing any legal action, so long as "the consumer has a right to cure the default." *Id.* § 537.5110(2). It is undisputed Richey had a right to cure default. *See id.* § 537.5110(3) (recognizing the circumstances when a consumer has the right to cure a default). The ICCC also provides that if Midwest failed to follow the appropriate procedures, its petition shall be dismissed. *Id.* § 537.5110(7).

Section 537.5111 sets forth the requirements for a notice to cure. A creditor gives notice to a consumer "when the creditor . . . mails the notice to the consumer at the consumer's residence." *Id.* § 537.5111(3). The consumer's residence is defined as

> the address given by [the debtor] as the [debtor's] residence in a writing signed by the [debtor] in connection with a transaction until the [debtor] *notifies* the person extending

>   credit of a different address as the [debtor's] residence, and it is then the different address.

*Id.* § 537.1201(4) (emphasis added). Thus, the creditor must mail the notice to cure to the address given by the debtor in a writing signed by the debtor in connection with the transaction. However, if the debtor later notifies the creditor of a different address, then the notice to cure must be mailed to the different address.

Richey claims the check presented to Midwest satisfied both statutory definitions of a consumer residence for the purpose of mailing a notice to cure. First, she claims the check presented to Midwest, together with her oral confirmation that the address on the check was her current residence, constituted a "writing signed by the debtor in connection with [the] transaction." *Id.* Second, she claims the check, together with her oral confirmation that the address on the check was her current residence, constituted notice to the creditor of a different address.

Both arguments by Richey are predicated on her testimony that she orally told Midwest during the course of the transaction that the address on her check was her current residence. Yet, the magistrate who presided over the hearing necessarily rejected this testimony, as did the district court. The evidence revealed that, pursuant to office protocol, Midwest would have placed the check address on the disclosure agreement if Richey had confirmed during the transaction that her check address was the correct address. By finding Richey failed to give Midwest her correct address during the course of the transaction, the magistrate, and the district court, necessarily rejected Richey's testimony that she told Midwest the address on the check was her current residence. *See Brichacek v. Hiskey*, 401 N.W.2d 44, 46 (Iowa 1987)

("When no motion to enlarge or amend is made, we assume as fact an unstated finding that is necessary to support the judgment."). Moreover, Richey then signed the disclosure statement containing an address purporting to be her residence, and there was no testimony that Richey later notified Midwest she lived at a residence different from the address on the disclosure agreement. Under the circumstances, Richey's residence for the purpose of mailing a notice to cure was the address on the disclosure statement signed by Richey in connection with the transaction. Midwest mailed the notice to cure to this address, and therefore complied with our statutory requirements.

Of course, the fact remains Richey presented Midwest with a check that revealed her correct address. While Richey has not argued this fact alone is sufficient, we find that simply providing a check with a different address, under the circumstances of this case, is not sufficient notice to comply with section 537.1201(4). Under section 537.1201(4), Richey's residence remained her Des Moines address until she notified Midwest of her West Des Moines address.

Richey next argues Midwest's disclosure statement inaccurately disclosed her rate of interest under the ICCC. In her reply brief, however, Richey admits she erroneously computed the interest rate, and Midwest's computation was correct. As a result, Richey now claims the interest rate on the disclosure agreement was not inaccurate, but deceptive and misleading under the ICCC. The ICCC requires the APR be disclosed according to the federal Truth in Lending Act. Iowa Code § 537.3201; *see* 15 U.S.C. §§ 1601 et seq. (2006). Yet, these provisions of the ICCC do not apply because the more specific DDSLA provides interest rate notice requirements of its own. *See* Iowa Code § 533D.9(2).

Richey has not argued these requirements were not met.[3] Furthermore, even if we accepted Richey's argument under the ICCC, we are not persuaded an admittedly accurate interest rate could be deceptive and misleading, or that a deceptive and misleading rate would enable Richey to prevail in this matter.

Last, Richey claims the interest rate charged by Midwest is unconscionable. Section 537.5108 of the ICCC allows a court to refuse to enforce a consumer credit agreement when the terms were unconscionable at the time of the transaction or if the agreement was induced by unconscionable conduct. *See Paglia v. Elliott*, 373 N.W.2d 121, 126 (Iowa 1985) (finding unconscionability under the criteria in section 537.5108); *see also Home Fed. Sav. & Loan Ass'n v. Campney*, 357 N.W.2d 613, 618 (Iowa 1984) (listing factors to determine unconscionability). Richey, however, makes no claim that the transaction in this matter was induced by unconscionable conduct. The only claim raised by Richey is that the amount of fees she paid pursuant to her agreement with Midwest is substantively unconscionable. *See Casey v. Lupkes*, 286 N.W.2d 204, 207 (Iowa 1979) (recognizing the test for when a bargain is unconscionable). The only factual findings of the district court related to the claim were the date Richey presented Midwest with her post-dated check, the amount of the check, the face amount of the loan, and the date the check could be cashed.

---

[3]It appears Midwest met the requirements. At the time of this transaction, section 533D.9(2) required Midwest to give Richey notice of (1) the fee, (2) the APR on the first one-hundred dollars, (3) the APR on subsequent one hundred dollars if different from the APR on the first one hundred dollars, (4) the date the check will be deposited, and (5) any penalty to be charged if the check bounces. The disclosure agreement Richey signed stated these requirements. Now, however, the current statute eliminates the second and third requirements noted above, and instead requires "[t]he annual percentage rate as computed pursuant to the federal Truth in Lending Act." 2006 Iowa Acts ch. 1042, § 31 (codified at Iowa Code § 533D.9(2)(*b*) (2007)).

In support of her claim, Richey cites section 537.2401(1) of the ICCC, which limits charges to twenty-one percent on consumer transactions. However, it is not possible to reasonably avoid applying the limitations in section 533D.9[4] of the DDSLA to this transaction. *See* Iowa Code § 537.1104. Therefore, the limitations of the DDSLA apply, and the limitations of the ICCC do not provide Richey with a basis for relief.

Richey also cites a number of cases and law review articles raising policy issues regarding the payday loan industry. *See, e.g.,* Charles A. Bruch, *Taking the Pay Out of Payday Loans: Putting an End to the Usurious and Unconscionable Interest Rates Charged by Payday Lenders*, 69 U. Cin. L. Rev. 1257 (2001); Creola Johnson, *Payday Loans: Shrewd Business or Predatory Lending?*, 87 Minn. L. Rev. 1 (2002). By enacting section 533D.9, however, the legislature has directly addressed the policy question of the level at which fees for payday loans become per se impermissible. Moreover, the fees Midwest imposed were permissible under the DDSLA.[5] While the existence of a legislative provision permitting fees on payday loans may not necessarily defeat all claims of

---

[4]Section 533D.9(1) provides:

> A licensee shall not charge a fee in excess of fifteen dollars on the first one hundred dollars on the face amount of a check or more than ten dollars on subsequent one hundred dollar increments on the face amount of the check for services provided by the licensee, or pro rata for any portion of one hundred dollars face value.

Iowa Code § 533D.9(1).

[5]The face amount of Richey's check was $450. The fee charged was $50. A $15 fee was charged on the first one hundred dollars, and three additional charges of $10 (representing a 10% fee) were charged for the remaining three one hundred dollars loaned. These four charges totaled $45. Then 10% of the remaining loan amount ($50) added $5 to the fee. This resulted in a total fee of $50, and was permissible under section 533D.9(1).

unconscionability, the court on this record will not entertain what amounts to a facial challenge of the legislature's policy determinations contained in section 533D.9 of the DDSLA.

## V. Constitutional Arguments.

Richey challenges section 533D.9 of the DDSLA as unconstitutional for five reasons. She believes section 533D.9 violates Article I, section 1 of the Iowa Constitution (the inalienable rights clause), and the equal protection and due process clauses of both the Iowa and federal constitutions. Section 533D.9 imposes limits on the charges lenders like Midwest can impose, and requires the disclosure of certain terms. The constitutionality of this section is an issue of first impression for the court. We initially note "statutes are cloaked with a presumption of constitutionality," and the challenger "bears a heavy burden, because it must prove the unconstitutionality beyond a reasonable doubt." *State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005).

## A. Whether Section 533D.9 is Unconstitutional Under Article I, Section 1 of the Iowa Constitution.

Article I, section 1, of the Iowa Constitution provides:

> All men and women are, by nature, free and equal, and have certain inalienable rights—among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness.

Iowa Const. art. I, § 1. This is known as the "inalienable rights clause." We most recently discussed this clause in *Atwood v. Vilsack*, 725 N.W.2d 641 (Iowa 2006). In *Atwood*, we noted the clause "secure[s] to the people of Iowa common law rights that pre-existed Iowa's Constitution." 725 N.W.2d at 651. We also recognized the following:

> It is well established that the protections of Iowa's inalienable rights clause are not absolute. The clause does

> not prevent all legislative action taken pursuant to the police power that benefits the community and impacts an inalienable right (i.e. a common law or natural right). Instead, it prevents only arbitrary, unreasonable legislative action that impacts an inalienable right.

*Id.* at 652 (citations omitted). Thus, the question is whether section 533D.9 impacts an inalienable right and is arbitrary and unreasonable.

Section 533D.9 impacts a property right. But it is far removed from the type of legislation that is arbitrary and unreasonable. Instead, and in accordance with all the provisions of the DDSLA, section 533D.9 creates protections for consumers and imposes limits on delayed deposit services. As Midwest points out, the largest check (or total amount of two checks) a delayed deposit lender can hold from a customer is $500. Iowa Code § 533D.10(1)(*a*), (*b*). Thus, the most that can be borrowed in a delayed deposit transaction is $445, if the maximum $55 is charged as a fee in accordance with section 533D.9(1). If the check is returned for insufficient funds or otherwise not paid, the most the customer will pay is $70, representing a $15 charge for the returned check. *Id.* § 533D.9(2)(*d*). Section 533D.9(1) prohibits a lender from charging more than $15 on the face amount of the first one-hundred dollars, and more than 10% on everything thereafter. *Id.* § 533D.9(1). Finally, the procedure must be fully disclosed to the customer. *Id.* § 533D.9(2), (3). While these limitations are not as protective as Richey would like, the statute is not arbitrary or unreasonable. A law that permits a business to engage in the "payday" loan procedure with these limitations does not violate article I, section 1 of the Iowa Constitution.

**B.    Whether Section 533D.9 is Unconstitutional Under our State and Federal Equal Protection and Due Process Clauses.**

In this case, there is no fundamental right or protected class involved.   Therefore, our analysis of Richey's substantive due process and equal protection claims is ultimately similar to our evaluation of the inalienable rights clause.[6]   The reasonableness of section 533D.9 is at issue again, and we must specifically determine whether it passes constitutional muster under a rational basis review.   *See Seering*, 701 N.W.2d at 662 (noting when no fundamental right is involved, "a statute need only survive a rational basis analysis" to meet the requirements of substantive due process); *Grovijohn*, 643 N.W.2d at 204 ("If the claimed dissimilar treatment does not involve a suspect class or a fundamental right, any classification made by the statute need only have a rational basis [to meet the requirements of equal protection].").   Moreover,

---

[6]Of course, evaluations of substantive due process and equal protection are not equivalent to an evaluation of the inalienable rights clause, nor are the evaluations of due process and equal protection equivalent to each other.   First of all, due process and equal protection claims require a showing of state action.   *See, e.g., Jensen v. Schreck*, 275 N.W.2d 374, 384 (Iowa 1979) ("A threshold question in a Fourteenth Amendment challenge is whether state action is involved . . . .").   We have never explicitly required a showing of state action under Iowa's inalienable rights clause.   *See, e.g., Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 176 (Iowa 2004) ("Thus, in determining whether the challenged statute violated article I, section 1 of the Iowa Constitution, we must determine (1) whether the right asserted . . . is protected by this clause, and (2) whether [the statute] is a reasonable exercise of the state's police power." (citing *Steinberg-Baum & Co. v. Countryman*, 247 Iowa 923, 929–30, 77 N.W.2d 15, 18–19 (1956))).   Regarding substantive due process, it must first be determined what right is involved, and then apply the corresponding test.   *See, e.g., Seering*, 701 N.W.2d at 662.   Regarding equal protection, it must first be determined if a classification is involved, and if so, apply the corresponding test.   *See, e.g., Grovijohn v. Virjon, Inc.*, 643 N.W.2d 200, 204 (Iowa 2002).

We seriously doubt Richey has shown sufficient state action to bring her substantive due process and equal protection claims.   We also seriously doubt Richey has shown she has been sufficiently classified to prevail in her equal protection claim.   *See Rosen v. Bd. of Med. Exam'rs*, 539 N.W.2d 345, 352 (Iowa 1995) (requiring a plaintiff to prove he or she "is similarly situated with persons who have been treated differently").   Nevertheless, because all of her constitutional claims are ultimately bound by a common thread of reasonableness, we will assume there was sufficient state action and a classification in order to review the statute under the rational basis test.

although Richey bases her claims on both the Iowa and federal constitutions, we need not interpret them differently in this case. *See Sanchez v. State*, 692 N.W.2d 812, 817, 819 (Iowa 2005) (noting we would not apply different analyses under the Iowa and federal constitutions when the parties have not articulated a reason for doing so); *State v. Davis*, 304 N.W.2d 432, 434 (Iowa 1981) ("The Supreme Court of Iowa is the final arbiter of the meaning of the Iowa Constitution, but when the federal and state constitutions contain similar provisions, they are usually deemed to be identical in scope, import, and purpose. Special respect and deference is accorded United States Supreme Court interpretations of similar language in the federal constitution.").

"Rational basis review requires only that the law 'be rationally related to a legitimate state interest.'" *State v. Simmons*, 714 N.W.2d 264, 277 (Iowa 2006) (quoting *Sanchez*, 692 N.W.2d at 817–18); *see Seering*, 701 N.W.2d at 662 (noting rational basis review "requires us to consider whether there is a 'reasonable fit between the government interest and the means utilized to advance that interest'" (quoting *State v. Hernandez-Lopez*, 639 N.W.2d 226, 238 (Iowa 2002))). We have also recognized "'[w]hen social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.'" *Sanchez*, 692 N.W.2d at 817 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313, 320 (1985)). While rational basis review is deferential to the legislature, "'it is not a toothless one.'" *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 9 (Iowa 2004) (citation omitted).

The State has a legitimate interest in protecting borrowers or limiting the fee delayed deposit lenders can charge. Section 533D.9 is certainly rationally related to this purpose. Section 533D.9(1) specifically limits the amount lenders can charge, and subsection (2) requires disclosure of all important terms. Iowa Code § 533D.9(1), (2). Moreover, Chapter 533D imposes important restraints on delayed deposit lenders that would otherwise not be imposed or complied with. *See, e.g., id.* § 533D.10(*f*) (prohibiting a lender from imposing any other fees than those allowed in section 533D.9(1) and (2)). While some, and certainly Richey in this case, believe the limits and protections in section 533D.9 authorize usurious terms, this is a concern that should be taken to the legislature, not the courts. *See Sanchez*, 692 N.W.2d at 817. We hold section 533D.9 passes rational basis review, and is therefore not a violation of equal protection or substantive due process.

**VI. Conclusion.**

We find the interest rate notice and limitation provisions of the DDSLA governed the transaction in this case and its provisions were met. Where the notice to cure provisions of the ICCC governed this transaction, its provisions were also met. We further find section 533D.9 of the DDSLA is constitutional. Accordingly, the judgment of the district court is affirmed.

**AFFIRMED.**